THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK A. PURSLEY, Defendant-Appellant.

Second District No. 2—94—0961

Opinion filed October 24, 1996.—Rehearing denied December 9, 1996.

Daniel M. Kirwan and Lawrence J. O'Neill, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Da-

vid A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Patrick Pursley, appeals his conviction of first degree murder. Pursley contends (1) the State did not prove beyond a reasonable doubt that he committed murder; (2) prejudicial and irrelevant evidence was improperly admitted; (3) the prosecutor engaged in purposeful misconduct in his opening statement; (4) the court failed to determine the voluntariness of a prior inconsistent statement; and (5) his sentence of natural life imprisonment is an abuse of discretion. We affirm.

On April 2, 1993, at approximately 10 p.m., Andrew Asher and his girlfriend, Becky George, were seated in a parked car in front of George's brother's apartment in Rockford. As they were talking, a man approached the driver's door, where Asher was seated, and pulled it open. The man pointed a gun at Asher and George and said, "This is a stickup, hand me your money." George grabbed about $60 from her purse and leaned over to put it on Asher's lap, and Asher reached into his pocket for his wallet. George testified that she held the money in her hand stretched out toward the robber but that he did not take it. She began to look for more money in her purse when she heard two "noises that were like pops." She turned toward Asher and saw him slouch down. Then, George stated that the robber turned toward the east and ran. George looked at Asher and noticed that he had been shot, so she ran to her brother's apartment and called the police.

The Rockford police did not find any suspects in the area but did find a spent bullet in the car. Additionally, the county coroner recovered a bullet from Asher's shoulder. A forensic scientist examined the bullets and determined them to be of 9 millimeter caliber fired from the same firearm.

George told the police that the man was wearing dark clothing and that she vividly remembered the man was wearing a blue ski mask with a hood over the mask. She also said that she saw black skin around the eyes.

On June 8, 1993, Marvin Windham called Crimestoppers about Asher's murder. He stated that he had visited Pursley the day after the murder and that Pursley told him that he killed Asher. Windham did not give his name.

On June 10, 1993, Officer Mark Schmidt and four other police officers set up a surveillance of an apartment the defendant shared with Samantha Crabtree. At 1:25 p.m., Pursley and Crabtree entered

a vehicle and Crabtree started driving. The officers followed in an unmarked van. While they were following the vehicle, the vehicle stopped suddenly and Pursley jumped out of the car and began running. The police attempted to pursue, but lost him. Crabtree voluntarily agreed to go to the police station.

On the way to the station, the police stopped at Crabtree's apartment and conducted a search pursuant to a valid search warrant. The police recovered a 9 millimeter gun, a black hooded sweatshirt, black jeans, and a document from the Illinois Department of Employment Security with Pursley's name on it.

At the station, Crabtree told the police that Pursley told her that if she ever said anything to the police he would kill her. At approximately 6 p.m., Crabtree took the police on the route Pursley and Crabtree took the night of Asher's murder. When they returned to the station, Crabtree made a statement outlining the events before, during, and after the murder. According to the statement, Crabtree and Pursley were out driving around to look for a house for Pursley to rob. She stated that Pursley was wearing black combat boots, black jeans, a black hooded sweatshirt, and had a navy blue ski mask with him. After they passed some apartments, Pursley told her to pull over to the side of Silent Road and wait there with the car running. Crabtree stated that Pursley exited the car and walked back toward the apartments they had just passed. Two or three minutes later, she heard gunshots. A minute later, Pursley returned to the car and told her to drive.

Crabtree stated that when Pursley returned to the car he was carrying her 9 millimeter gun in his hand. She said that while she was driving home she made several wrong turns because she was nervous and that Pursley threatened several times to kill her. When they arrived at her apartment, Crabtree said that Pursley took what "looked like" about $100 from his pocket. She stated that later that night she and Pursley saw a news report concerning Asher's death, and Pursley told her not to say anything to anyone.

On June 12, 1993, Windham called Crimestoppers again after hearing that the police were unable to arrest Pursley on June 10. He also gave a statement to the police.

On June 16, 1993, the police received a call from Crimestoppers that a suspect by the name of Patrick Pursley was walking around the Fairground housing projects. The police searched the area, but could not find Pursley. The police then received another Crimestoppers call that the suspect was just seen running northbound. While searching the area, an officer observed a person hiding under a ramp of an abandoned building. The police pulled out the person, who was Pursley, and arrested him.

At trial, George testified to the events of that evening, and a ballistics expert testified that the 9 millimeter gun the police found at Crabtree's apartment was the weapon used in Asher's murder. Diane Winters, a friend of Pursley, testified that Pursley called her a month before Asher's murder and asked if she would buy bullets for Crabtree's gun.

Windham testified that he visited Pursley early in April 1993, at which time Pursley showed him a newspaper clipping about the murder and told Windham how he had robbed Asher and George and then killed Asher. On cross-examination, Windham stated that he had received a total of $2,650 in reward money for his information. Additionally, Windham said that the reason he waited two months after learning Pursley was the murderer before calling Crimestoppers was because Pursley did not threaten him until June 1993. Windham also admitted that he had two criminal charges currently pending against him.

Crabtree's testimony at trial contradicted her June 10, 1993, statement and her testimony before the grand jury. At trial, she stated that her prior two statements were coerced and that she and Pursley did not leave her apartment on April 2, 1993.

Several witnesses testified to the whereabouts of Pursley on April 2. Myra Foster, the grandmother of Pursley's nine-year-old son, Anthony, and Tracy Foster, Anthony's mother, testified that on April 2 Pursley was in Rockford with his son and Aaron, Myra's seven-year-old son. However, on cross-examination they admitted that two weeks before their testimony they told the police that they were not sure that Pursley came to Myra's home on April 2.

Penny Bunnell, a friend of Mrs. Foster, testified that on April 2, 1993, she was visiting Mrs. Foster when Pursley came and picked up Anthony and Aaron for a visit around 5:30 p.m. that day.

Eleven-year-old Aaron Davis and ten-year-old Anthony Pursley testified that Pursley took them to his house the night of April 2. They both stated that they and Pursley played with Anthony's chemistry set until 11 p.m. on April 2 and that Pursley never left the house. On cross-examination, however, Aaron stated that he thought that April 2 was a Saturday. Also, they both admitted that they told the police two weeks before their testimony that Pursley had picked them up in the afternoon, not at night.

Sixteen-year-old David Bodell testified that he lived in the neighborhood where Asher was murdered. He stated that on April 2, 1993, he heard three gunshots and a woman scream. He said that "not too long" afterward he walked outside and saw a man crouched down in front of a dumpster that was located about 30 feet from him.

Bodell testified that the man began running toward an open field and Silent Road Trail when the police sirens "started coming," which was about 30 or 40 seconds after he saw the man. He said that the man was about 6 feet 3 inches tall and that he could not tell if the man was black or white. On cross-examination, Bodell stated that the man was "either a white male with a very dark tan or possibly black." Additionally, Bodell stated that he told a police officer on April 3, 1993, that the man was wearing a dark blue sweatshirt and black jeans and ran in a southeasterly direction across a field after hearing the police sirens.

Finally, Pursley presented his own ballistics expert, who testified that he was unable to make a conclusive identification that the bullets from the scene were fired from Crabtree's gun.

On rebuttal, a police officer stated that the distance between where Bodell showed him he was standing to the dumpster was about 100 feet and that Bodell told him that the man was black.

The jury found the defendant guilty of first degree murder. At sentencing, the court noted Pursley's "long history of criminal conduct" and sentenced him to natural life without parole.

■ We turn first to Pursley's claim that the jury improperly heard evidence that tended to show that he had the propensity to commit other crimes. Evidence is relevant if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence. *People v. Williams*, 228 Ill. App. 3d 981, 989 (1992). Indeed, evidence will not be excluded merely because it may prejudice the accused. *People v. Calderon*, 98 Ill. App. 3d 657, 661 (1981). It is within the discretion of the trial court to decide whether evidence is relevant and admissible. *People v. Hayes*, 139 Ill. 2d 89, 130 (1990). Consequently, a trial court's determination of whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Nichols*, 235 Ill. App. 3d 499, 506 (1992).

■ Pursley points this court to statements made by three witnesses. First, Pursley argues that Ms. Winter's testimony regarding his request that she buy bullets for Crabtree's gun because he did not want the bullets traced to him was extremely prejudicial and served no purpose other than to show that Pursley had the propensity to commit violent crimes in the month before Asher was killed. We disagree. Evidence that tends to prove a fact in issue is admissible even though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried. *People v. McDonald*, 62 Ill. 2d 448, 455 (1975). Moreover, while evidence may not be introduced solely to show a defendant's propensity to commit a

crime, the State may offer testimony relating to events that are not themselves criminal offenses that go to the motive and intent of the defendant. *People v. Rachel*, 123 Ill. App. 3d 600, 605-06 (1984).

We agree with the trial court that Ms. Winter's testimony was relevant and did not raise any inference of a propensity to commit a crime. The State presented evidence through a ballistics expert that Crabtree's 9 millimeter Taurus gun was the firearm involved in the murder. Ms. Winter testified that Pursley asked her to buy bullets for Crabtree's 9 millimeter gun. A substantial part of Pursley's defense was denying that the 9 millimeter Taurus gun found in Crabtree's apartment was connected to him. Ms. Winter's testimony, however, established that Pursley was aware of Crabtree's gun. Further, her testimony established the availability and proximity of the gun to Pursley. As a result, we find that the trial court did not abuse its discretion by determining that Ms. Winter's testimony helped show that Pursley had access to the alleged murder weapon.

■ The second instance of alleged misconduct involves statements by Windham. During cross-examination, the defense asked Windham about the alleged threats Pursley made to him in June that led to Windham's calling Crimestoppers. On redirect examination, the prosecutor questioned Windham about what Pursley said to him, and Windham replied, "He said before he go back to the penitentiary he will know who told, either me or [Crabtree], and he will—." The defense objected to Windham's statement, and the court overruled the objection. On appeal, Pursley argues that Windham's statement was improper because it showed his propensity to commit crimes. We disagree. A defendant is entitled to have his guilt or innocence determined solely with reference to the crime charged. *People v. Gregory*, 22 Ill. 2d 601, 603 (1961). Accordingly, it is well settled that evidence of other offenses unrelated to the crime for which a defendant is on trial is incompetent. *People v. Goodwin*, 69 Ill. App. 3d 347, 349 (1979). However, it is also well settled that a party who "opens the door" on a particular subject is barred from objecting to questioning based upon the same subject. *People v. Griffiths*, 112 Ill. App. 3d 322, 328 (1983).

■ We find that the court did not abuse its discretion by admitting Windham's testimony because the defense "opened the door" by calling into question this issue. From reviewing the transcripts of the trial in this case, it is clear that the defense strategy was to show that Windham created his story concerning Pursley to capture reward money and to gain assistance with other criminal matters. The defense repeatedly asked whether Windham invented his story after reading newspaper articles about the case and asked him about

his prior drug use and current problems with the law. Further, the defense questioned Windham about the reward money he received and why he waited two months before calling Crimestoppers. Finally, the defense asked Windham about Pursley's threat several times and implied that Windham had made up his entire meeting with Pursley to make money.

When the State attempted to rehabilitate its witness, the defense objected to Windham's testimony stating how Pursley threatened him. We find that, by questioning Windham's credibility and his testimony that Pursley threatened him, the defense opened the door regarding Pursley's threat to Windham. See *People v. Dent*, 266 Ill. App. 3d 680, 687 (1994) (defense "opened the door" to the prosecutor's rehabilitating his witness by informing the jury that the witness did not have a criminal record, and made prior consistent statements, because defense strategy was to implicate the witness in the murder and show that the witness was an original suspect and had omitted pertinent information when giving his statement to the police). Thus, in the present case we find that the trial court did not abuse its discretion by refusing to grant a mistrial or strike Windham's testimony.

■ Pursley argues that another statement by Windham also amounts to prejudicial error. When discussing Pursley's threat on redirect examination, Windham also stated that Pursley told him that if Windham wanted to continue to visit Pursley, Windham would have to "start doing crimes" with him. The defense objected to this testimony, and the court sustained the objection. Then, the court instructed the jury to disregard the answer. Pursley, however, contends that the instruction did not cure the error and the statement denied him a fair trial. We disagree. First, we find that Windham's statement was not "highly prejudicial" and note that there is nothing in the record to show that the jury did not follow the court's instruction. See *People v. Jones*, 222 Ill. App. 3d 206, 211 (1991). Second, we find that the comment concerned Pursley's threat, to which the defense opened the door as previously discussed. Accordingly, Windham's second statement does not amount to prejudicial error warranting a reversal.

■ The next instance of alleged error concerns the testimony of Officer Ronald Gillardo, who testified to the circumstances surrounding Pursley's arrest. Pursley argues that Officer Gillardo's testimony that Pursley was hiding under a ramp when he was arrested was substantially prejudicial. Pursley also contends that Officer Gillardo's testimony of the Crimestoppers tip—"that a suspect by the name of Patrick Pursley wearing dark clothing carrying a shotgun was walk-

ing"—denied him a fair trial because it showed that he had a propensity to commit other crimes. We disagree. Other crimes evidence is properly admitted to show identity, absence of mistake, defendant's state of mind, and the circumstances of his arrest. *People v. Wilson*, 257 Ill. App. 3d 826, 831 (1994). Moreover, evidence of other crimes is admissible when it is relevant to the police investigation of the offense at issue where such investigatory procedures involved an integral part of the circumstances of the defendant's arrest. *People v. Davis*, 93 Ill. App. 3d 187 (1981). Indeed, evidence of flight is admissible as a circumstance tending to show a consciousness of guilt. *People v. Harris*, 52 Ill. 2d 558, 561 (1972). Overall, the determination of the admissibility of evidence, including evidence of other crimes, rests within the discretion of the trial court, and that decision will not be reversed absent a clear abuse of discretion. *People v. Holloway*, 225 Ill. App. 3d 47, 51 (1991).

■ We find that the court did not abuse its discretion by admitting Officer Gillardo's testimony regarding the events leading up to Pursley's arrest. The State presented evidence that the police chased Pursley on June 10, 1993, after he ran from Crabtree's vehicle, but that they lost him. Consequently, on June 12, 1993, Pursley knew that the police were looking for him, and testimony that he was hiding is relevant to show Pursley's consciousness of guilt. Further, Officer Gillardo's reporting the context of the Crimestoppers tips solely recounts the police procedure in apprehending Pursley. The tips led the police to Pursley by telling them that a man known as Pursley was wearing dark clothing and holding a shotgun in a certain area of the city. Accordingly, the tips were relevant to show identification and the procedure used to arrest Pursley.

Finally, aside from Officer Gillardo's testimony, no evidence was presented concerning whether Pursley possessed a shotgun when he was arrested or whether he committed a crime with the shotgun. Officer Gillardo merely recounted the circumstances surrounding Pursley's arrest and how the police located and identified Pursley. Therefore, we find that the events leading up to Pursley's arrest were relevant, even if they were also prejudicial, and conclude that the court did not abuse its discretion in allowing Officer Gillardo to testify to these events.

■ Pursley's second contention is that the prosecutor engaged in misconduct in his opening statement by referring to Pursley as an "executioner," which denied him a fair trial. A prosecutor may make unfavorable comments about the accused. He may also make statements and arguments and draw reasonable inferences that are based on the proofs in the case in front of the jury. He may even go so far

as to "denounce [the accused's] wickedness." *People v. Terrell*, 62 Ill. 2d 60, 64 (1975). On the other hand, prosecutors may not engage in inflammatory arguments designed solely to arouse the passions of the jury. *People v. Johnson*, 119 Ill. 2d 119, 139 (1987). Nevertheless, improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused. *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

In *Terrell*, the prosecutor referred to the defendant as a punk. The supreme court stated that the definition of punk was a ruffian or hoodlum and that the conclusions the prosecutor made could well have been within the dictionary definition of the words used. Indeed, the court noted that the language was "needlessly harsh," but affirmed the appellate court's ruling that the comment did not warrant reversible error. *Terrell*, 62 Ill. 2d at 64.

In the present case, the prosecutor referred to Pursley as an "executioner" in his opening statement. According to the dictionary, an executioner is "one that puts to death." Webster's Third New International Dictionary 794 (1986). From the facts in this case, we find that the prosecutor could have drawn this inference. Moreover, we do not believe that the word "executioner" carries the same connotation as other remarks found to be reversible error. See *Tiller*, 94 Ill. 2d at 320-21 (prosecutor referred to defendant as an animal and compared the crime to the Nazi holocaust); *People v. Payton*, 72 Ill. App. 2d 240, 249-50 (1966) (prosecutor made numerous improper remarks, one of which referred to the defendant as a beast).

In this case, the prosecutor used the word "executioner" once, and this occurrence was in his opening statement. Consequently, the word at issue was an isolated remark that was not dwelled upon further by the prosecutor. See *Johnson*, 119 Ill. 2d at 140 (prosecutor's improper remark was an isolated incident that did not constitute reversible error). Moreover, in his opening statement, defense counsel reiterated that opening statements were not evidence, but that opening statements are only a "sketch of what *** the evidence [the prosecutor] believes will show." Indeed, defense counsel even addressed the jury concerning the prosecutor's use of the word "executioner" and warned the jury not to let "emotions and sympathy" get in the way of Pursley's right to a fair trial. Thus, we find that the prosecutor's remark, even if it was inappropriate during the opening statement, does not constitute reversible error because it was not a material factor in Pursley's conviction.

■ Next, Pursley contends that Crabtree's June 10, 1993, statement to the police and her grand jury testimony were erroneously admitted into evidence. Pursley concedes that these statements meet

the statutory requirements of section 115—10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—10.1 (West 1994)) for admission of prior inconsistent statements, but argues that, because the court did not make an initial determination regarding the voluntariness and reliability of the statements, Pursley's due process rights were violated. We disagree. The fact that a statement is admissible under section 115—10.1 of the Code *already* demonstrates its reliability, so no *additional* evidence of the statement's reliability need be shown. *People v. Carlos*, 275 Ill. App. 3d 80, 84 (1995).

The facts of *Carlos* parallel the facts in the present case. In *Carlos*, the defendant argued that a trial court must make a finding that a prior inconsistent statement is reliable and trustworthy in addition to finding that the statement meets the Code's requirements. The appellate court disagreed, stating that in section 115—10.1 the legislature expressly enumerated the circumstances it concluded would indicate a prior inconsistent statement was reliable. *Carlos*, 275 Ill. App. 3d at 84; see also *People v. Fauber*, 266 Ill. App. 3d 381, 391 (1994). Similarly, in the case at bar Pursley argues that the court should have made a determination that Crabtree's statements were voluntary, even though the statements met the Code's requirements. We decline to adopt the defendant's argument.

Pursley points this court to *People v. Johnson*, 255 Ill. App. 3d 547 (1993), to show that a determination of voluntariness is required in addition to meeting the requirements of section 115—10.1. In *Johnson*, the Appellate Court, First District, stated that it would violate the defendant's due process rights to admit a prior inconsistent statement, even if the statement met section 115—10.1's requirements, unless an evidentiary basis that the statement was voluntary and reliable was established. *Johnson*, 255 Ill. App. 3d at 558. Accordingly, the court noted that, before a prior inconsistent statement is admissible for constitutional purposes, the trial court must find that there is a sufficient evidentiary basis from which a jury could find that the declarant's prior statements were knowing and voluntary. *Johnson*, 255 Ill. App. 3d at 559.

When determining whether the declarant's prior inconsistent statements were voluntary in the case before it, the *Johnson* court explained that the State presented evidence that the declarant signed a statement and that the declarant voluntarily testified before the grand jury. Consequently, the court determined that there was a sufficient reliable basis for the admission of the prior statements. This analysis, however, is exactly the same as section 115—10.1 requires. Indeed, as the *Carlos* court noted, the legislature determined what would constitute reliability when drafting section 115—10.1.

Therefore, a finding of reliability and voluntariness is automatically made by concluding that a prior statement meets section 115—10.1's test. Accordingly, no additional analysis is needed. Certainly, even the *Johnson* court agrees that it is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony. See *Johnson*, 255 Ill. App. 3d at 559. As a result, we agree with the Appellate Court, Fourth District, that if a prior inconsistent statement meets section 115—10.1's requirements it may be admitted into evidence without an independent determination of its voluntariness.

 Pursley's fourth contention is that the State failed to prove beyond a reasonable doubt that he murdered Asher. Pursley argues that he had an unimpeached alibi defense, Bodell observed a man with different physical characteristics hiding near the scene, Crabtree testified that her previous statements were untrue, Windham's testimony was not credible, and the State's ballistic expert was contradicted by another ballistics expert. We disagree. It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. *People v. Frieberg*, 147 Ill. 2d 326, 359 (1992). Indeed, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Frieberg*, 147 Ill. 2d at 360. A conflict in the evidence does not establish a reasonable doubt, and a jury verdict based on substantial and credible evidence is not rendered reversible by the fact that other evidence was introduced which might, if believed, have resulted in a different verdict. *People v. Mendoza*, 208 Ill. App. 3d 183, 204 (1991). Instead, only where the record leaves the reviewing court with a grave and substantial doubt of guilt should the conviction be reversed. *Mendoza*, 208 Ill. App. 3d at 204.

 In the present case, the evidence was sufficient to prove Pursley guilty beyond a reasonable doubt. The jury chose to believe the State's evidence, and we do not find that the testimony of Bunnell, Crabtree, and Pursley's ballistics expert raises a substantial doubt of guilt such that a reversal of Pursley's conviction is warranted.

Although Crabtree testified that she lied in her police statement and before the grand jury, the jury could have reasonably believed that she had previously told the truth and was lying at the trial. Similarly, although Aaron and Anthony testified that they were with Pursley on April 2 and that he did not leave the house, they also admitted that they had told the police investigators a different ver-

sion of April 2 just two weeks before the trial. Moreover, both Aaron and Anthony repeatedly stated that they thought that they had visited Pursley on a Saturday. The jury could have reasonably believed that the children had confused the dates and that they were not with Pursley on Friday, April 2.

The same inferences can be made regarding Bodell's testimony and Windham's testimony. Although the defendant states that Windham's criminal history and the reward money motivated him to create a story implicating Pursley in the murder, the jury could have reasonably believed that he was telling the truth concerning his meeting with the defendant. Additionally, Bodell's testimony contradicted what he told the police immediately after the murder, and the jury could have reasonably believed he was mistaken about the distance from his garage to where he saw a man hiding from the police. Finally, it is immaterial that the defense's ballistics expert contradicted the State's expert. It is settled law that the trier of fact has the duty to resolve contradictory expert testimony. *People v. Horne*, 247 Ill. App. 3d 192, 198 (1993). Therefore, we find that the State did prove Pursley guilty of Asher's murder beyond a reasonable doubt.

Finally, Pursley erroneously contends that his sentence of natural life imprisonment is excessive. A reviewing court may alter the sentencing judge's disposition only upon a finding of abuse of discretion. *People v. Cox*, 82 Ill. 2d 268, 275 (1980). Numerous witnesses testified for Pursley at the sentencing hearing. After all the testimony was heard, the court noted that the defense presented testimony that showed Pursley to be intelligent, capable of forming and nurturing loving relationships, and that he had made efforts to further his education. The court stated that, even with the mitigating factors, the court's responsibility was to weigh the mitigating and the aggravating factors and to balance them. The court explained that, because of some of the unusual facts and circumstances of the case, it would decline to impose the death penalty. The court added that although Pursley had good qualities it believed that the defendant, due to his criminal record, was a menace to society. Accordingly, the court sentenced Pursley to life imprisonment without parole.

After our review of the record, we conclude that the court did not abuse its discretion in imposing this sentence. Indeed, the court balanced the mitigating factors with the defendant's criminal history. Moreover, the record shows that the court carefully considered the mitigating factors, and these factors played an essential role in not sentencing Pursley to death. Therefore, we find that Pursley's sentence is not excessive.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

DOYLE and HUTCHINSON, JJ., concur.