10 June 1999

No. 2--97--1133  
 

________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Winnebago County.

)

Plaintiff-Appellee, ) 

)

v. ) No.  95--CF--2590

)

RICHARD L. HOWARD,       ) Honorable 

) Rosemary Collins,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE GEIGER delivered the opinion of the court:

Following a jury trial, the defendant, Richard L. Howard, was convicted of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9--1(a)(2)) and sentenced to a term of natural life imprisonment without the possibility of parole.  On appeal, the defendant contends that the trial court abused its discretion by (1) permitting the State to bolster a witness's testimony through the use of the testimony of an expert witness; (2) admitting evidence of his abusive behavior that occurred after the victim's death; (3) tendering to the jury a modified form of an Illinois Pattern Jury Instruction regarding evidence of his other crimes;  (4) failing to allow his attorney to review a diary written by the State's chief witness; and (5) imposing a sentence of life imprisonment.  We reverse the defendant's conviction and remand the cause for a new trial.

I.  Facts

The following facts are relevant to the disposition of this appeal.  On November 8, 1995, the defendant was indicted for first-

degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9--1(a)(2)).  Specifically, the indictment alleged that, between February 1 and April 1, 1990, the defendant beat Carrie Gaines (the victim), knowing such act created a strong probability of death or great bodily harm.

On June 21, 1996, the defendant filed a motion to produce  copies of diaries written by Sherri Gaines (Sherri), the victim's mother.  After conducting an 
in camera
 review, the trial court denied the defendant's motion.  The trial court explained its ruling as follows:

"I've read through every page, 200, 300, pages ***.

***

***[T]here's no direct mention made of the deceased child anywhere in any of these writings, but I think I should tell you this, there are 2 pages here, 2, 3, part of which makes some allusions to the time that the child died.  It is in no sense inconsistent with the statement she made to the police so it would be my judgment it's not admissible as a prior consistent statement. *** I don't think it's admissible or relevant or would lead to anything that is relevant.  None of the rest of this makes any reference to, directly or indirectly, really to the event or events surrounding the death of the child nor even to the child ***."

Prior to trial, the defendant filed two motions 
in limine
.  The first motion sought to exclude evidence of the defendant's abusive behavior occurring on dates that were not alleged in the indictment.  The defendant's second motion 
in limine
 sought to exclude the expert testimony of Anna Wilson on the issue of whether Sherri suffered from battered woman syndrome.  The defendant argued that such evidence was irrelevant to any issue in the instant case.

 In response to the defendant's motions, the State argued that the evidence of other incidents of the defendant's abusive behavior was relevant to show intent.  In addition, the State argued that Wilson's testimony was necessary to explain Sherri's failure to report the victim's death.  On August 29, 1997, the trial court issued a ruling providing as follows:

"1.  The People may introduce evidence of defendant's prior acts of violence against [the victim] on the issue of intent and lack of mistake;

2.  The People may introduce evidence of defendant's prior acts of violence against Sherr[i] Gaines 
***
.  These prior acts of violence are relevant to explain why Gaines permitted the clandestine burial of her child; why Gaines chose to remain in the same household with the defendant for five years; why Gaines participated in a pattern of deception concerning the whereabouts of [the victim] between 1990 and 1995; and to explain why Ms. Gaines did not notify the police of the victim's death.

3.  All other prior acts of violence committed by the defendant are inadmissible."

The case then proceeded to trial.  The State first presented the testimony of Sherri Gaines.  Sherri testified that she had two daughters: Cherish, born in March 1987, and the victim, born in May 1988.  In November 1989, she and her two daughters moved in with the defendant, who lived at 3120 Searles Avenue in Rockford.  Sherri testified that, on the average, the defendant beat her three times a week.   On several occasions, Sherri developed bruises on her face, back, arms, and legs as a result of the defendant's beatings.  

Sherri further testified that, in the four months prior to the victim's death, the defendant struck the victim between 12 and 24 times.  She testified that the incident that caused the victim's death occurred in March 1990.  On the night in question, the victim was sleeping in bed next to Sherri.  At about midnight, the defendant came home drunk.  When he entered the bedroom, he slapped Sherri on the head, causing her to fall to the floor.   At that time, Sherri was 3½ months pregnant. 

After Sherri fell to the floor, the victim began crying.  The defendant then slapped the victim.  The victim began crying louder.  When Sherri went towards the victim, the defendant shoved Sherri down and kicked her in the head and stomach.  When Sherri "balled up," the defendant kicked her in the back.  

Sherri testified that the defendant then picked the victim up and threw her against a wall.  The victim fell to the ground crying.  The defendant then picked the victim up by her left arm and kicked her hard in the stomach, back, and buttocks.  According to Sherri, at that time the defendant weighed about 250 pounds and was wearing hiking boots.  The defendant kicked the victim several times and then "let her fly into the air" about four feet.  The victim landed on the floor, crying and bleeding from the mouth.  The defendant then told Sherri that, if he got into trouble because of her or her "little bitches," he would have her "tracked down." The defendant then left.  Afterwards, Sherri picked the victim up and put her in bed.  The victim had dark marks on her stomach and back.  Sherri testified that the victim closed her eyes and slept.  She testified that she did not call the police or take the victim to the hospital because she was afraid of the defendant.

The following morning, the victim became unconscious.  The defendant placed the victim on the floor and tried to revive her.  However, the victim did not respond.  Sherri believed that the victim had died.  Sherri held the victim, and the defendant left.  Sherri testified that she wrapped the victim in a purple blanket.

According to Sherri, the victim's body remained inside the house.  The next day, Sherri and the defendant went to a friend's house on Arthur Avenue in Rockford and cleaned up the backyard.  While in the backyard, Sherri saw a hole that was two feet deep behind the garage.  After Sherri and the defendant returned home, the defendant took a box into the bedroom where the victim's body was located and closed the door.  He later walked out of the house with the box.  When Sherri went back into the bedroom, she saw that the victim's body and the purple blanket were gone.  She and the defendant moved out of their residence on Searles Avenue two weeks after the victim's death.

Sherri testified that she continued to live with the defendant for almost five years following the victim's death because she was afraid of going to jail and losing custody of her children.  She testified that, on one occasion in 1993, she needed stitches above her eye after having been beaten by the defendant.  On another occasion in 1993, the defendant punched her and knocked out four of her teeth.  Sherri testified that she finally left the defendant in March 1995 because he would not stop using cocaine.  In October 1995, Sherri was questioned by the police regarding the victim's death.  She led the police to the yard where the victim's body was buried.  Sherri testified that she no longer had custody of her two other children and that she did not expect to receive anything in exchange for testifying against the defendant. 

Officer Brian Harrison of the Winnebago County sheriff's office also testified on behalf of the State.  He testified that on October 24, 1995, he participated in an excavation at 1308 Arthur Avenue in Rockford.  During the excavation, the police unearthed human skeletal remains wrapped in a blanket.  

The State also presented the testimony of forensic pathologist, Dr. Larry Blum.  Dr. Blum testified that on October 26, 1995, he conducted an examination of the skeletal remains in question.  Dr. Blum opined that the child who had been buried was approximately 21 months of age.  Dr. Blum testified that his examination revealed eight rib fractures as well as a fractured femur and clavicle.  He opined that the child had suffered from battered child syndrome, a condition marked by multiple fractures at various stages of healing.  He further opined that the child's death was caused by multiple blunt trauma to the chest and abdomen.  On cross-examination, he testified that it was possible that the child could have also died from drowning.

Kandy Larson also testified on behalf of the State.  Larson testified that she had known Sherri for 20 years.  She testified that, during Sherri's relationship with the defendant, she saw injuries on Sherri on about two dozen occasions.  She further testified that she had seen the defendant strike Sherri and also saw him throw an object at her.  Larson believed that this object was either a glass or an ashtray.  She also testified that she once saw the defendant hit Cherish with a belt three or four times when they lived on Searles Avenue.

The State also presented the testimony of Jerry Johnson, Sherri's brother.  Johnson testified that he lived with Sherri and the defendant in 1989 and 1990.  He testified that, after the defendant and Sherri moved away from Searles Avenue, he saw the defendant hit Sherri on the head with a phone.  He remembered seeing bruises and other injuries on Sherri on at least three dozen occasions.

Cheryce Mercaitis also testified on behalf of the State.  Mercaitis testified that she had known Sherri since middle school.  Mercaitis never saw the defendant strike Sherri.  However, after Sherri and the defendant moved away from Searles Avenue, Mercaitis did see Sherri with black eyes and bruises on her arms.  In addition, sometime in 1990, she saw the defendant poke Cherish with a pool cue six or seven times.

The State also presented the expert testimony of psychologist Anna Wilson.  Wilson indicated that she had testified as an expert on the subject of battered woman syndrome in approximately 180 trials.  Wilson testified that husbands who batter their wives typically possess traits of extreme jealousy and possessiveness and commonly abuse drugs or alcohol.  She further testified that battered women tend to have low self-esteem, take responsibility for the batterer's actions, deny the severity of the abuse, and have trouble remembering details of the abuse.  

Wilson testified that she interviewed Sherri for 30 hours, reviewed police reports, interviewed Sherri's parents and Cherish, gathered information about Sherri's childhood and her history of physical abuse, and administered a mental status exam to Sherri. Wilson testified that, based upon her evaluation, Sherri had suffered from battered woman syndrome from the time of the victim's death in 1990 through 1995.  She testified that there was no evidence that Sherri was trying to deceive her during the interview.  On cross-examination, she testified that she found no evidence that Sherri was lying about the circumstances of the victim's death.   

The defendant testified on his own behalf.  He testified that  the victim died sometime in March 1990.  He testified that, on the date in question, the victim and Cherish were in the bathtub.  When he and Sherri went into the bathroom to check on the girls, they saw the victim lying face down in the tub, submerged in the water.  The defendant pulled the victim out of the bathtub.  When he determined that the victim was not breathing, he blew into her mouth, pushed on her stomach, and hit her chest to revive her.

The defendant testified that eventually the victim began breathing again.  He and Sherri wrapped the victim in a blanket or towel and put her in their bed.  Within an hour, the victim had a seizure, which lasted for about two to five minutes.  After the seizure, the victim was able to breathe on her own.  He testified that Sherri did not want to get help from anyone because she was worried that she would lose custody of her children. 

The following afternoon, the defendant went to a bar and came back home after about a half hour.  After he returned home, the victim began spitting up.  The defendant held her upside down and gave her a "pretty good shaking" to clear the fluids out of her lungs.  The victim then had another seizure and stopped breathing.  The defendant testified that he grabbed the victim by her feet, "jerked her up," and pounded on her back to try to revive her.  Although his attempts were unsuccessful, the defendant did not get medical assistance for the victim.

The defendant testified that the victim's body remained in the bedroom for two days.  Then he buried the victim's body in the backyard of a house located at 1308 Arthur Avenue in Rockford.  He admitted that he did not have a good reason for failing to take the victim to a hospital.

On cross-examination, the defendant admitted that in his October 24, 1995, statement to the police he stated that two days after the victim's death he put her body in a cardboard box and then put the box in his car.  He testified that he kept the victim's body in the backseat of his car for two days.  The defendant told the police that he did not report the victim's death because he knew that she had bruises from past punishments.  He admitted that these bruises were severe enough to make him concerned that the police would suspect abuse. He also admitted that he made arrangements to clean the yard in question, that he dug the victim's grave, and that he buried the victim's body. 

He further testified that he was six feet two inches tall and weighed 240 pounds at the time in question.  He admitted that, when he was first questioned by the police, he denied any involvement in the incident.  He admitted that at the time of the victim's death he was using marijuana.  He admitted that in December 1989 there were times when he would come home drunk and abuse the victim and Cherish.  He testified that he had bruised the victim's legs, buttocks, and cheeks.  Following the defendant's testimony, the defense rested.  

Following deliberations, the jury found the defendant guilty of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9--

1(a)(2)).  The trial court sentenced the defendant to a term of natural life imprisonment without the possibility of parole.  After the denial of his posttrial motion, the defendant filed a timely notice of appeal.

II.  Analysis

A.  Expert Testimony Regarding Battered Woman Syndrome

We first address the defendant's argument that the trial court erred in admitting the expert testimony of Anna Wilson.  As noted above, Wilson testified that Sherri suffered from battered woman syndrome from 1990 through 1995 and that there was no evidence that Sherri was trying to deceive her or that she was lying.  The defendant contends that Wilson's testimony should not have been admitted by the trial court as it was based upon his abusive behavior towards Sherri following the victim's death and was used solely in an attempt to bolster Sherri's credibility as a witness.   In response, the State argues that, because Sherri was the only eyewitness to the victim's death, her credibility was critical.  The State therefore contends that Wilson's testimony was necessary to explain Sherri's behavior subsequent to the victim's death. 

The admission of expert testimony is a matter within the discretion of the trial court.  
People v. Thill
, 297 Ill. App. 3d 7, 11 (1998).
  The trial court's decision will not be disturbed absent an abuse of discretion.  
Thill
, 297 Ill. App. 3d at 11.  A trial court should allow expert testimony only if (1) the proffered expert has knowledge and qualifications uncommon to lay persons that distinguish her as an expert; (2) the expert's testimony would help the jury understand an aspect of the evidence that it otherwise might not understand, without invading the province of the jury to determine the credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles.  
People v. Simpkins
, 297 Ill. App. 3d 668, 681 (1998).

We are unaware of any case precisely on point as to this issue.  However, we find 
Simpkins
 instructive.  In 
Simpkins
, the defendant was convicted of aggravated criminal sexual assault against his child.  
Simpkins
, 297 Ill. App. 3d at 675.  At trial, the victim 
recanted her allegations of abuse.  
Simpkins
, 297 Ill. App. 3d at 673.  The trial court subsequently allowed the State to present the testimony of a Department of Children and Family Services (DCFS) investigator on the subject of recantation by sexually abused children.
  
Simpkins
, 297 Ill. App. 3d at 674. 

On appeal, the reviewing court held that the trial court abused its discretion in allowing such testimony.  
Simpkins
, 297 Ill. App. 3d at 683-84.  In so ruling, the court concluded that the investigator's testimony did not aid the jury in reaching its conclusion and severely impinged upon the province of the jury to determine credibility and assess the facts of the case.  
Simpkins
, 297 Ill. App. 3d at 683.  In addition, the court stated as follows:

"When stripped to its basic level, [the investigator's] testimony regarding recantation by child victims constitutes a commentary on [the victim's] credibility, similar to eyewitness opinion testimony.  In essence, [the investigator] was being asked to give his opinion on the believability of [the victim], the child witness in this case. *** Just as trial courts reject defense attempts to offer purported expert testimony attacking witnesses' credibility, so should trial courts reject the State's attempt to use purported expert testimony to bolster witnesses' credibility."  
Simpkins
, 297 Ill. App. 3d at 683.

We believe that such a conclusion is also appropriate in the instant case.  After reviewing the record, we conclude that Wilson's opinion testimony that Sherri suffered from battered woman syndrome from 1990 through 1995 did not aid the jury in reaching its conclusion (see 
Simpkins
, 297 Ill. App. 3d at 683), especially since that time period includes four years after the victim's death.  While Wilson's testimony explained why Sherri did not report the victim's death, such evidence was not relevant to the issue of whether the defendant murdered the victim. 

Furthermore, we believe that Wilson's testimony that there was no evidence that Sherri was trying to deceive her impinged upon the province of the jury to determine Sherri's credibility and assess the facts of the case.   See 
Simpkins
, 297 Ill. App. 3d at 683.  As in 
Simpkins
, we believe that Wilson's testimony regarding battered woman syndrome constitutes a commentary on Sherri's credibility.  See 
Simpkins
, 297 Ill. App. 3d at 683.  Indeed, we note that Wilson testified that there was no evidence that Sherri was lying.  As mentioned above
, trial courts should reject the State's attempts to use expert testimony to bolster the credibility of witnesses, as these are matters best left to the trier of fact.  See 
Simpkins
, 297 Ill. App. 3d at 683.  For all of these reasons, we conclude that the trial court abused its discretion in allowing Wilson's testimony regarding battered woman syndrome. 

In so ruling, we find the cases cited by the State to be distinguishable from the case at bar.  See 
People v. Evans
, 271 Ill. App. 3d 495 (1995);  
People v. Wasson
, 211 Ill. App. 3d 264 (1991);  
People v. Nelson
, 203 Ill. App. 3d 1038 (1990);  
People v. Server
, 148 Ill. App. 888 (1986);
 
  
People v. Minnis
, 118 Ill. App. 3d 345 (1983)
.  Unlike the instant case, 
in 
Nelson
 expert testimony concerning child sexual abuse syndrome was found to be admissible only on rebuttal after the victim's credibility had been attacked.  See 
Nelson
, 203 Ill. App. 3d at 1045.  In 
Wasson
 and 
Server
, expert testimony regarding psychological syndromes was deemed admissible to explain the behavior of a victim, not an eyewitness.  See
 
Wasson
, 211 Ill. App. 3d at 272; 
Server
, 148 Ill. App. 3d at 899.  Furthermore, in
 
Evans
 and 
Minnis
, expert testimony regarding battered wife syndrome was deemed admissible to explain the defendant-wife's state of mind during the murder of her husband.  See 
Evans
, 271 Ill. App. 3d at 503;  
Minnis
, 118 Ill. App. 3d at 357.  

For the reasons discussed above, we believe that the trial court abused its discretion in admitting the opinion testimony of Wilson.  We further conclude that the trial court's error in admitting the expert testimony caused substantial prejudice to the defendant and denied him a fair trial.  We therefore reverse the defendant's conviction and remand the cause for a new trial.  

As our resolution of this issue controls our disposition on appeal, we need not address the defendant's arguments regarding the other crimes jury instruction or his sentence.  We also note that the remaining evidence presented at trial was sufficient for the jury to conclude that the defendant was guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9--1(a)(2)) beyond a reasonable doubt.  Thus, we remand for a new trial, noting that the defendant faces no risk of double jeopardy on retrial.  See 
People v. Taylor
, 76 Ill. 2d 289, 309 (1979).  Our holding, however, does not constitute an implication as to the defendant's guilt or innocence which would be binding on retrial.  See 
Taylor
, 76 Ill. 2d at 310.

B.  Other Issues on Remand

Although we are remanding this case for a new trial, we will briefly address the defendant's remaining contentions should they arise again on remand.

1.  Evidence of the Defendant's Abusive Behavior Following the Victim's Death

The defendant argues that the trial court erred in admitting evidence of his abusive behavior following the victim's death.  Specifically, the defendant argues that Sherri should not have been permitted to testify as to (1) the frequency of his beatings following the victim's death; (2) specific incidents of his abuse that occurred after the victim's death; and (3) his abuse of drugs following the victim's death.  

The defendant also argues that Larson, Johnson, and Mercaitis were improperly permitted to testify about incidents in which he abused Sherri and Cherish after the victim's death.  The defendant notes that Larson testified that she saw him throw an object at Sherri; Johnson testified that he saw him hit Sherri with a telephone; and Mercaitis testified that she saw him poke Cherish with a pool cue and that she saw Sherri with bruises.  The defendant contends that the aforementioned testimony violated the trial court's ruling on his motion 
in limine
 and improperly bolstered Sherri's testimony.   

It is within the discretion of the trial court to determine whether evidence is relevant and admissible.  
People v. Pursley
, 284 Ill. App. 3d 597, 603 (1996).  The trial court's determination will not be reversed absent an abuse of discretion.  
Pursley
, 284 Ill. App. 3d at 603.  Evidence is relevant if it tends to make more or less probable the existence of any fact that is of consequence to the determination of the action.  
People v. Hope
, 168 Ill. 2d 1, 23 (1995). 

In the instant case, we conclude that evidence regarding the defendant's abusive behavior following the victim's death is inadmissible.  We do not believe that such evidence tends to make more or less probable the existence of any fact which is of consequence to the determination of this action.  See 
Hope
, 168 Ill. 2d at 23.  We therefore conclude that such evidence should not be admitted on retrial.

2.  The Diaries of Sherri Gaines

The defendant next argues that there may be information in Sherri's diaries that could exculpate him.  As noted above, the trial court conducted an 
in camera
 review of the diaries at issue, determined that the information contained therein was irrelevant to the case at bar, and denied the defendant's production request.  The defendant requests that we review the diaries at issue to determine whether the trial court abused its discretion.

As noted above, it is within the discretion of the trial court to determine whether evidence is relevant and admissible.  
Pursley
, 284 Ill. App. 3d at 603.  The trial court's determination will not be reversed absent an abuse of discretion.  
Pursley
, 284 Ill. App. 3d at 603.

After reviewing the documents at issue, we conclude that the trial court did not abuse its discretion in denying the defendant's motion.  Although there are certain pages of the diaries that allude to the victim's death, the material contained therein is consistent with Sherri's testimony.  In addition, we do not believe that the remaining material contained in the diaries is relevant to the case at bar, as such material does not tend to make more or less probable the existence of any fact that is of consequence to the determination of this action.  See 
Hope
, 168 Ill. 2d at 23.  We therefore conclude that the trial court did not abuse its discretion in excluding such evidence.

III.  Conclusion

For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

McLAREN and GALASSO, JJ., concur.