# Illinois Official Reports

## Appellate Court

***People v. Wills*, 2017 IL App (2d) 150240**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSIAHA R. WILLS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0240 |
| Filed | December 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Ogle County, No. 14-CF-26; the Hon. John C. Redington, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Eric Morrow, State's Attorney, of Oregon (Patrick Delfino, Lawrence M. Bauer, and Ivan O. Taylor, Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justice Burke concurred in the judgment and opinion.<br>Justice McLaren specially concurred, with opinion. |

**OPINION**

¶ 1        Defendant, Josiaha R. Wills, appeals from his convictions of four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). He contends that the court's hearsay-rule exclusion of a witness's testimony concerning an argument between defendant and the alleged victim, his daughter A.W., was first-prong plain error. We affirm.

¶ 2                                I. BACKGROUND

¶ 3        Defendant was charged by information with the four counts of predatory criminal sexual assault of a child of which he was ultimately convicted. As amended, count I charged that defendant "committed an act of sexual penetration with A.W., who was under 13 years of age, in that [defendant] put his penis in the mouth of A.W." The amended count II charged that defendant "put his penis in the anus of A.W.," the amended count III charged that defendant "put his mouth on the vagina of A.W.," and the amended count IV charged that defendant "put his finger in the vagina of A.W." The State alleged that each of these offenses had occurred between May 1, 2013, and January 31, 2014.

¶ 4        Defendant had a jury trial. The State had six witnesses: (1) A.W., who was nine years old when the trial took place; (2) Merry Demko, M.D., who conducted a physical examination of A.W.; (3) Gregory Welenc, a school-bus driver who had driven A.W. and her siblings to school; (4) Kelly Albrecht, A.W.'s school counselor; (5) Kevin Wills (Kevin), defendant's father; and (6) Traci Mueller, a forensic interviewer at Shining Star Children's Advocacy Center (Shining Star). The defense called 10 witnesses, of whom 7 had not previously appeared. Those seven were (1) Arma Johnson, an investigator for the Department of Children and Family Services (DCFS), (2) Rita Taconna, a sign-language interpreter, who testified as an expert in American Sign Language (ASL), (3) Airia Burgett, a one-time neighbor of defendant and his children, (4) Melodee Hoffman, who had been defendant's girlfriend, (5) Jason White, the Mount Morris chief of police and defendant's acquaintance, (6) Christine Wills (Christine), defendant's sister and neighbor at the apartment that defendant shared with Kevin, and (7) defendant himself.

¶ 5        At the trial, A.W. was the State's first witness. She testified that her birthday was May 5; she was not sure what year she was born, but she was nine years old and in fourth grade. She had two brothers, B.W., age 10, and M.W., age 6. She was then living with a foster parent in Sycamore with whom she had gone to live part of the way through her third-grade year. Before then, she had lived with her paternal grandfather, her brothers, and defendant in a one-bedroom apartment. The children slept in the bedroom, with defendant sleeping in a sleeping bag on the floor. However, A.W. also said that defendant and her grandfather both slept in beds they had in the living room.

¶ 6        A.W. had difficulty communicating with defendant because he was deaf and used sign language, which she had never learned well. B.W. was a much more fluent signer, so he often interpreted for her.

¶ 7        During the first part of her third-grade year, A.W. had regular appointments to leave class to see "Mrs. A."—which was how she referred to Albrecht. January 31, 2014, had been unusual because Albrecht took her out of class twice. The second time she went to see

Albrecht, she wrote a "paper" about "what [her] dad did," which was admitted in evidence. It said:

"he makes me suck his weniey [*sic*]

he liks my huehee [('hoo hoo')]"

A.W. told Albrecht that "wiener[s]" and "hoo-hoo[s]" were the parts that boys and girls use to "[p]ee."

¶ 8 A.W. testified about the abuse itself. She said that defendant would come into the living room, pull his shorts down, sit on the bed, and make her kneel to "suck his wee-wee." One time that this happened, she felt so disgusted that she threw up. Sometimes something yellow and white came out of his "wiener" when it was in her mouth. He also made her do the same thing in the bedroom, but lying front-to-front on the floor so that he could also "lick[ her] hoo-hoo." He sometimes "would pull his wiener back and forth through [her] bottom." This was "disgusting and very hurtful" and, when he did it, she would kick defendant or elbow him. He also had sometimes taken his hand and "rub[ed] it on [her] hoo-hoo." This had happened when her brothers were sleeping in the bedroom with her. She had been "[s]even through eight" when these things happened, was in third grade, and was living in the apartment with defendant and her grandfather.

¶ 9 A.W. testified that defendant said that he would kill her if she told anyone what happened. She demonstrated the gestures that defendant used to make this threat, which seemed to have been ordinary miming gestures—he pointed at himself, drew his finger across his throat, and then pointed toward her.

¶ 10 On cross-examination, A.W. said that all of the contact with defendant that she had described took place at night when the lights were off. Defendant had also made her watch "sex" videos—she spelled this out, S-E-X—on his phone.

¶ 11 Defense counsel asked A.W. if she knew someone named Joe Jackson; she responded that Jackson had been married to her mother. She agreed that Jackson had sexually abused her. It happened once only; Jackson took her into the bathroom and made her "suck his wienie." She thought that the abuse by Jackson occurred after the abuse by defendant. It happened when she was staying with her mother in the house that her mother shared with Jackson.

¶ 12 Demko testified after A.W. She explained that she was a family physician at KSB Hospital and a volunteer physician at Shining Star. She had conducted a complete physical examination of A.W., finding nothing abnormal. However, children who have been sexually abused typically show no physical evidence of the abuse. Demko testified that such normal findings were typical even in cases with pregnant victims, in which the evidence of abuse is conclusive.

¶ 13 Welenc, the bus driver, was the third witness. He said that he drove A.W. and her brothers to school for part of A.W.'s third-grade year. On January 31, 2014, A.W. and her brothers were being particularly loud and disruptive on the bus, so he had them stay aboard when he arrived at the school, to ask them why they were misbehaving. A.W. told him, " 'It's because our life sucks. We live with our dad.' " Welenc noticed that A.W. seemed to be about to cry as she answered, so he suggested to the three that they could sit near him on the return trip to talk and joke around. He let the three off and drove the bus back to the garage, but the interaction "really bothered [him]." He decided that he needed to tell A.W.'s school

counselor what he had heard, so he immediately drove his car back to the school, sought out A.W.'s counselor, and reported the conversation.

¶ 14    Albrecht's testimony picked up where Welenc's left off. She had come to know A.W. after A.W.'s third-grade teacher gave A.W. a referral for counseling services. Albrecht had seen A.W. once a week and 13 or 14 times before January 31, 2014. She had not planned to meet with A.W. on January 31 until Welenc spoke with her, but, based on what he said, she pulled A.W. from class. In the counseling office, Albrecht told A.W. what Welenc had said and asked her what was going on. A.W. answered that her father " 'never let[ them] do anything fun, and he yell[ed] at [them] and he [did] mean things to [them].' " When Albrecht asked what the mean things were, the first thing that A.W. said was, " 'If he knew I told you, he'd slap me.' " But Albrecht persuaded A.W. that it would be safe to talk. A.W. then told her, " 'At night when my brothers are asleep, he comes in and does bad things to me.' " Albrecht stopped the conversation then and went to her "principals." Together, they decided that they needed more information about the "bad things" before anyone called DCFS.

¶ 15    Albrecht and the director of counseling, Shannon Cremens, met again with A.W. later that day. Albrecht asked A.W. to explain more specifically what "bad things" her father had done, and A.W. asked if she could write them down. Albrecht said that she could, and that was when she wrote that "he" licked her "hoo hoo" and made her suck his "wieniey." Albrecht could not make sense of a word that appeared in A.W.'s handwriting as "huehee," so she asked A.W. what it was. A.W. whispered to her, " 'It's the word for girls' private parts.' " Albrecht left A.W. with Cremens and went to call DCFS.

¶ 16    On cross-examination, Albrecht conceded an inaccuracy in the testimony she had just given; she and her "principals" had not merely decided that they needed more specifics from A.W. Instead, her initial call to the DCFS hotline was rejected because the information was insufficiently specific. Only then did they decide to interview A.W. further. Albrecht also agreed that during their earlier meetings A.W. had not disclosed anything that suggested abuse.

¶ 17    Defendant's father Kevin testified for the State but only to say that defendant's birth date was April 8, 1981, and that the apartment that he had shared with defendant was in Ogle County.

¶ 18    Mueller testified after Kevin, describing the setup for her January 31, 2014, interview of A.W. at Shining Star. The interview room had a microphone and ceiling camera to record interviews and to allow viewing from another room.

¶ 19    The State played the recording of A.W.'s interview for the jury. A.W.'s disclosures in the interview were essentially consistent with her testimony. As in her conversation with Albrecht, A.W. preferred writing things to saying them when she found them hard to discuss. She wrote on a large pad or flip chart that Mueller used as an interviewing tool.

¶ 20    A.W. said that the last incident of abuse had occurred just after the family moved back in with her grandfather. Nothing had happened while they were living with Hoffman, but things had happened the previous time that they had lived with her grandfather. All the incidents had taken place in the bedroom except that, when her grandfather was in the hospital, defendant had once taken her into the living room. She could not say how many times he had made her "suck his wiener," but he had put his "wiener" in her "butt" 10 times. He had also put his mouth on her "boobs."

¶ 21 Mueller asked if anyone else had ever done things to her that were like what her father had done. A.W. said that Joe Jackson had, and she described a single incident in terms similar to those in her testimony. Mueller asked her if she had ever told anyone else about that, and she said that she had not; she had told her mother that Jackson had pulled her hair, but that was all. She was emphatic that Jackson was not with her mother anymore.

¶ 22 During the first part of the interview, A.W. had described her interactions with defendant in such a way that Mueller had not realized that defendant was deaf. Mueller did not learn that he was until she left to check whether she needed to ask any more questions. When she returned, she said that she had spoken with "Jason White," who had told her that A.W.'s father was deaf. She asked A.W. how she communicated with defendant, and A.W. said, "sign language." A.W. said that defendant never communicated through spoken words, but that she could sign a little. She demonstrated a few signs for words and as many letter signs as she could remember for Mueller.

¶ 23 Mueller asked A.W. how she got along with her grandfather. A.W. answered that he kept them healthy and fed them when her father was over at his friend's place smoking and doing drugs. Mueller asked her who defendant's friend was, and she said, "Jason White."

¶ 24 Defense counsel cross-examined Mueller after the recording had finished, asking her whether someone named "Jason White" had driven A.W. to Shining Star. Mueller agreed that Jason White, the chief of police of Mount Morris, had brought A.W. to the interview. The State rested after the cross-examination of Mueller.

¶ 25 The defense opened its case by recalling A.W.; the questioning focused on instances in which A.W. had said that Jackson was her only abuser. A.W. denied having told Albrecht that everyone had made a big mistake in thinking that her father had done things that Jackson had actually done. She remembered meeting Arma Johnson, the person who had driven her to see Demko, but denied having spoken to Johnson about Jackson. However, when the question was rephrased, she said that she might have told Johnson that Jackson was her actual abuser, but she was not certain about what she had said. She remembered talking to Mueller about Jackson, she was not sure if she had talked to her one-time neighbor Airia Burgett about Jackson, and she was certain that she had not talked to Hoffman about Jackson.

¶ 26 On cross-examination, A.W. agreed that, between the time she talked to Mueller and the time she went to see Demko, she had talked to her "Aunt Christine." Christine had told her that she was wrong about defendant; Jackson was the person who had abused her.

¶ 27 Defendant next called Albrecht, who agreed that she had talked with A.W. while she kept A.W. company when A.W. was waiting to go to see Demko. During their conversation, A.W. told Albrecht that everyone had misunderstood her; Jackson was the one who had abused her, not defendant.

¶ 28 Johnson, whom the defense called next, was a DCFS investigator. In early February 2014—possibly on February 3—she picked up A.W. to take her to see the doctor. No real conversation occurred during the ride, but A.W. told her that there had been a mistake:

"[A.W.] *** told me when I picked her up, she said that you guys have it wrong, everything that I said, you thought it was about my dad, but it was actually about Joe Jackson, and that was the extent of the conversation."

¶ 29 Johnson had first met A.W. on January 24, 2014, while she was investigating a claim that defendant had medically neglected and inadequately supervised A.W.'s brothers. As part of

that investigation, Johnson met with M.W. at Kevin's apartment. A.W., B.W., and Kevin were present. A.W. joined in the discussion while Johnson was interviewing M.W.; Johnson had the impression that A.W. thought that she was speaking in M.W.'s defense. Johnson thought that A.W. seemed comfortable speaking out. Nevertheless, A.W. said nothing at the time to suggest that she had any other concerns.

¶ 30      On cross-examination, Johnson said that she stayed with A.W. and her brothers after A.W. reported the abuse. When the police arrested defendant, Johnson took the siblings back to their apartment. She noted at the time that Christine, who had an apartment just down the hall from Kevin, was expected to help Kevin with the care of A.W. and her brothers.

¶ 31      Taconna, defendant's ASL expert, testified that she had viewed the video of Mueller interviewing A.W., focusing particularly on the part of the interview when A.W. had discussed how she communicated with defendant and had demonstrated some signs. Taconna opined that A.W. displayed some knowledge of alphabetic signs but did not know all the letters and formed others incorrectly. The gestures that A.W. had demonstrated for defendant's threat to kill her had some characteristics of ASL but were essentially just gestures of the kind that hearing people use.

¶ 32      Burgett, defendant's neighbor, testified that she had lived 20 feet down a row of apartments from defendant. On a date that Burgett could not pin down, A.W. came to her apartment, and they had a conversation in which A.W. talked about having been abused by Jackson. Burgett's testimony was interrupted as the parties agreed to a stipulation:

     "The parties stipulate that if [defense counsel] were to recall [A.W.] to testify, she would state as follows: Number one, she never told Airia Burgett that her mom made her shower with Joe Jackson and she never told Airia Burgett that Joe Jackson touched her in the shower.

     Number two, she would state she never told Melodee Hoffman that Joe Jackson got in the shower with her and she never told Melodee Hoffman that Joe Jackson peed in her mouth."

When Burgett resumed testifying, she stated that, as best she could remember, her conversation with A.W. about Jackson had taken place in February or March 2014. A.W. told Burgett that her mother made her take showers with Jackson and that Jackson touched her when they were in the shower together. Burgett did not question A.W. about the abuse, but she did tell defendant what A.W. had said. On cross-examination, she admitted that the conversation could not have taken place when she thought it did and likely took place in 2013.

¶ 33      Hoffman, defendant's former girlfriend, testified that she had dated defendant "for a while" and that she had lived with him and the children near the end of 2013. While she was living with them, and sometime before Halloween 2013, she had a conversation with A.W. about Jackson: "[She said t]hat he *** had gotten into the shower with her, and that he had peed in her mouth and made her throw up." Hoffman clarified that A.W. was describing two separate incidents.

¶ 34      Hoffman said that, while she was dating defendant, she had paid for a cell phone that she allowed him to use; the "data capability" for the account was "turned off at the company level." Hoffman overheard A.W. using the phone to talk to her mother:

"Q. [Defense counsel:] Were you aware of any argument between [defendant] and [A.W.] about [A.W.] visiting her mother?

A. [Hoffman:] Yes.

Q. And when did you first become aware of that?

A. November.

Q. And how did you become aware of that?

A. Listening to [A.W.'s] side of a conversation where she was speaking on that phone with her mom.

Q. And after she talked with her mother, was there then an argument or disagreement between [A.W.] and [defendant]?

A. Yes.

Q. And were you present when that happened?

A. Yes."

Defense counsel wanted Hoffman to describe the argument, but the court sustained the State's hearsay objection. This interaction is what led to defendant's claim on appeal:

"Q. [Defense counsel:] And what was, what was said, what did [A.W.] say, what did [defendant] say?

MS. SWITZER [Assistant State's Attorney]: Objection, hearsay.

THE COURT: As to what [A.W.] said, certainly it's hearsay, and I'm going to sustain the objection.

\*\*\*

Q. What did, what did [defendant] tell [A.W.] as a result of that conversation?

A. She, she nor the other children were going to spend the summer with their mom.

Q. And what was [A.W.'s] reaction to that, that you observed?

A. Very angry.

Q. Did that conversation or that argument or disagreement continue past that phone call and the incident you just talked about?

A. Yes.

Q. On more than one occasion?

A. Yes.

Q. And on those other occasions, are you able to give a specific dates [*sic*] on any of those?

A. I'm not.

Q. On any of those other occasions, did [A.W.'s] attitude about being very angry and upset with her father change at all?

A. No, she was angry every time.

Q. And did [defendant's] position change that she was not going to spend the summer with her mom?

A. No, she was not going to spend the summer."

¶ 35     On cross-examination, the State asked Hoffman why she did not tell defendant what A.W. had said to her about Jackson. Hoffman answered, "Because it was a story she told before about other people."

¶ 36     White, the chief of police in Mount Morris, testified that he had watched Mueller's interview of A.W. on a monitor as it occurred. He heard A.W. name "Jason White" as the friend with whom defendant did drugs. White did not know anyone else named "Jason White" in Mount Morris. He said that he had never "done drugs with [defendant] or anybody, period, myself." However, he did think that he was a friend to defendant: "[W]hen he got his kids back I took him to the school to register the kids, he had no transportation. I believe I gave him the suit that he's wearing today." He had also lent money and a vehicle to defendant.

¶ 37     Defense counsel recalled Kevin, who testified about when defendant lived in his apartment and what the sleeping arrangements were, and then called defendant's sister Christine. Christine testified through the ASL interpreter, but explained that she, unlike defendant, had some hearing and sometimes communicated in spoken English. No more than a day after defendant's arrest, she and A.W. had a "voiced" conversation:

"Q. [Defense counsel:] What did you say to [A.W.] and what did she say to you?

A. [Christine:] I told [A.W.] why did you say that to the school, and she said yes, he did, I said no, he did not. I said you lied.

Q. Go ahead.

A. I said you lied to the school. She said no, I didn't. I said yes, you did, and you know better."

Christine said that the conversation had ended after that.

¶ 38     Defendant was the final witness. He was 33 years old and had been profoundly deaf since he had scarlet fever at age 2. He always communicated with his children using ASL and, because he hoped that A.W. would become an ASL interpreter, he avoided using informal gestures with them. A.W. had difficulty learning to sign, so B.W. or, when B.W. was absent, Kevin would interpret for defendant.

¶ 39     Defendant had gained custody of his children in January 2013, and on February 1, 2013, he moved into an apartment of his own in the complex where Burgett (whom he already knew) was his neighbor. He lived there for only four months, through May. After that, the children stayed with their mother in Iowa for a few months before they came back to live with him in his father's apartment. At some time after his father came back from the hospital, perhaps in September 2013, he and the children moved in with Hoffman, but they moved back in with his father around Christmastime.

¶ 40     Hoffman had let him use a cell phone for a while. However, he had never used it or any other phone to show any kind of video to A.W.

¶ 41     A few days before his arrest, his children's mother had sent him a text saying that she wanted to talk to the children on the phone. He called her back with a stored number and then handed the phone to the children. They were excited about the call and took the phone into the bedroom to talk to her. A.W. was "all very excited" after the call and told him that "she was going to spend the whole next summer with her mother." Defendant responded, "[N]o, you're not going to your mother's for any reason." A.W. became angry, and she and defendant argued about the issue for days. Defendant could read lips a bit and understood

A.W. to have said that she was very excited to spend the summer in Missouri with her mother.

¶ 42 Defendant had watched the interview video with an interpreter. He understood what A.W. was claiming he did, and he denied that any of it had happened.

¶ 43 On cross-examination, defendant testified that he had known about Jackson's abuse of A.W. because she had told him about it. The testimony that the State elicited from defendant thereafter is difficult to follow. The gist of it seems to have been that, when defendant first got custody of his children, they were living with their mother in Iowa. Jackson was not there with them. The children later went back to their mother while defendant was in jail. When he went to pick them up after that, they were in Sterling, Illinois, and Jackson was with their mother. When he got out of jail, friends told him that A.W. had said that Jackson had abused her, and A.W. repeated this to him when he arrived in Sterling. He went to the Sterling police department to report Jackson, but there was no one there who could interpret. He became frustrated and left without making a report.

¶ 44 The State introduced evidence of defendant's conviction of aggravated battery, and the defense and the State both rested at the end of defendant's testimony.

¶ 45 The jury returned guilty verdicts on all counts, taking no more than 30 minutes, according to defendant's motion for a new trial. Defendant raised 5 claims of error in his motion, including 1 claim with 10 subclaims, but none of them relates to the matter he raises here. The court granted defendant's motion in part, denied it in part, and, based on problems with the jury instructions, set aside defendant's conviction on count IV. It imposed a sentence of 12 years' imprisonment for each of the three remaining convictions, with the terms to be served consecutively. Defendant moved to reconsider the sentence; the court denied the motion and granted a motion by the State to dismiss count IV, which was still technically pending. Defendant filed a notice of appeal that day.

¶ 46 II. ANALYSIS

¶ 47 On appeal, defendant argues that it was first-prong plain error for the court to "preclude[ ] Ms. Hoffman from testifying about A.W.'s statements to [defendant] after her phone call with her mother, which went directly to A.W.'s motive to falsely accuse [defendant]." He argues that Hoffman's testimony was "not offered to prove the truth of anything A.W. said, but rather to show A.W.'s desire to spend the summer with her mother." He thus contends that the testimony was nonhearsay or was admissible to show A.W.'s state of mind. He argues that "arbitrary exclusion of evidence and in particular erroneous application of a hearsay rule to exclude evidence critical to a defendant's case," such as he contends occurred here, violates the due process clause of the United States Constitution's fourteenth amendment (U.S. Const., amend. XIV).

¶ 48 The State responds (1) that any error was not such that it prevented defendant from putting on his defense and (2) that the court did not abuse its discretion when it excluded Hoffman's testimony about the argument. On the first point, it argues that Hoffman's excluded testimony would have added little to the evidence that A.W. was angry with defendant. On the second point, it asserts that defendant was trying to elicit the testimony to show that A.W.'s mother had *in fact* invited the children to stay with her for the summer, a hearsay purpose.

¶ 49    Defendant replies that "generic testimony that A.W. was 'angry' [was] not sufficient to convey the scope of the motive she had to falsely accuse [him]." He argues that the specifics of what A.W. thought her mother had offered—the length of the visit and the possible activities—were critical to conveying why she would have been motivated to falsely accuse defendant. He contends that it was not relevant whether A.W.'s mother had *in fact* invited her, but that A.W.'s *belief* about the invitation was clearly relevant to why she might have wanted to lie about defendant.

¶ 50    We agree with defendant that Hoffman's statement was admissible. However, the error does not rise to the level of plain error. We thus affirm.

¶ 51    Initially, we point out that defendant's argument is constrained by defense counsel's failure to make an offer of proof of Hoffman's excluded testimony. "It is well settled that when a defendant asserts that [he] has not been given the opportunity to prove [his] case because the trial court improperly barred evidence, [he] must provide the court of review with an adequate offer of proof as to what the excluded evidence would have entailed." *People v. Way*, 2017 IL 120023, ¶ 33. "The purpose of an offer of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced." *People v. Peeples*, 155 Ill. 2d 422, 457 (1993). The "offer need not be a formal elicitation of the witness's testimony under oath" (*People v. Gibbs*, 2016 IL App (1st) 140785, ¶ 36), but it must be specific and provide the details of the evidence that the party intended to present (*Way*, 2017 IL 120023, ¶ 33).

¶ 52    Here, the State does not argue that the lack of an offer of proof defeats defendant's claim. Moreover, the parties appear to be in general agreement about what Hoffman's testimony would have been. We therefore give defendant the benefit of assuming that Hoffman's testimony would have been consistent with what other testimony suggests. That benefit gets defendant only so far, however. Defendant asserts that Hoffman would have been able to provide details of A.W.'s reaction to her mother's offer of a visit that the other witnesses did not know. We cannot assume that. We can accept that Hoffman must have overheard an argument between defendant and A.W. after A.W. and her mother discussed a visit. But nothing in the principles of appellate review permits us to assume that Hoffman's testimony would have contained details not suggested by the record. Thus, when we later address whether the error was plain error, we cannot take as true defendant's assertion that Hoffman could have supplied details that others could not.

¶ 53    Defendant concedes that he did not preserve his claim of error, so that any review must be under the principles of the plain-error doctrine. The plain-error doctrine serves as " 'a narrow and limited exception' " to the general forfeiture rule. *People v. Szabo*, 113 Ill. 2d 83, 94 (1986) (quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982)). The plain-error doctrine is set out in *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005), and clarified in *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). *Piatkowski* explains:

    "We now reiterate that the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error [(first-prong plain error)], or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless

- 10 -

of the closeness of the evidence [(second-prong plain error)]." *Piatkowski*, 225 Ill. 2d at 565.

Here, although error occurred, the error could not have changed the outcome of the case—it could not have "tip[ped] the scales of justice against the defendant." *Piatkowski*, 225 Ill. 2d at 565. Thus, there was no first-prong plain error.

¶ 54   The court erred in excluding Hoffman's testimony as hearsay. Under Illinois Rule of Evidence 801(c) (eff. Jan. 1, 2011), " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Under Illinois Rule of Evidence 801(a) (eff. Jan. 1, 2011), a " 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

¶ 55   A trial court has discretion to decide whether to admit or exclude a statement under hearsay rules, but the question of whether a statement is inadmissible hearsay is one of law when the determination does not "involve fact finding or weighing the credibility of the witnesses." *People v. Kent*, 2017 IL App (2d) 140917, ¶ 132. More generally, a trial court's discretion to make evidentiary rulings does not extend to making rulings that rest on errors of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 56   The court could not have made the ruling here without making an error of law. Initially, we agree with defendant that it was A.W.'s *belief in* an invitation from her mother, not *the existence of* that invitation, that was relevant here. The State argues:

> "[Contrary what to defendant contends, the] argument between A.W. and the defendant centered around the fact that A.W. was invited to spend the summer with her mother. This fact is part of the defendant's trial defense that A.W. is falsely accusing him do [*sic*] to his denying this invitation to A.W. As the out of court statement was being used for the truth of the matter asserted, the trial court properly sustained the People's objection."

We do not agree with the State's assertions here, the logic of which is unclear. The State seems to imply that, if A.W.'s mother had not actually invited A.W., it would have been unlikely that A.W. would have been angry about it, so that it mattered whether the invitation was real. But, if that is the State's argument, it makes defendant's point for him, as the truth of the invitation's existence is relevant only because it makes A.W.'s belief more or less likely. Because the case was concerned only with how strongly A.W. believed that her father was depriving her of a visit, almost any assertion that A.W. might have made about the visit—other than an assertion of her own state of mind—would thus have been admissible for nonhearsay purposes. Therefore, when the court ruled, "As to what [A.W.] said, certainly [Hoffman's testimony is] hearsay," its ruling rested on an error of law.

¶ 57   Moreover, if A.W. did make assertions that would have been relevant for their truth, they would likely have been declarations of her own state of mind and thus admissible hearsay. Hearsay is admissible, regardless of the declarant's availability, and with exceptions inapplicable here, if it is a "statement of the declarant's then existing state of mind." Ill. R. Evid. 803(3) (eff. Jan. 1, 2011). Defendant testified that A.W. had said that she was very excited to spend the summer in Missouri with her mother. That was an assertion of A.W.'s own state of mind and thus admissible. Hoffman presumably heard similar assertions from A.W.

¶ 58        Although the court erred in excluding the evidence, that error could not have affected the outcome of the case. Defendant argues that the exclusion of Hoffman's testimony about the argument prevented him from adequately making a case that A.W. fabricated the crimes out of anger at defendant's refusing to let her visit her mother. We disagree that this evidence was critical to that defense. Even if we could assume that the evidence would have been as detailed as defendant says it would have been, it would not have dramatically changed the trial. Welenc testified that A.W. told him that the siblings had misbehaved "because our life sucks. We live with our dad." That testimony supported the defense. Albrecht's testimony that A.W. told her that their father " 'never let[ them] do anything fun, and he yell[ed] at [them] and he [did] mean things to [them]' " further supported the defense. With that before the jury, defendant needed only to have the jury understand that the "fun" he was not letting A.W. have was the visit to their mother. That idea came through clearly in Hoffman's testimony and his own. See *People v. Davidson*, 160 Ill. App. 3d 99, 119 (1987) (no plain error where evidence at issue is "cumulative of other evidence properly admitted").

¶ 59        To be sure, hearing details of what A.W. hoped her summer would have been like might have cemented the idea of her anger in the jurors' minds, making the defense more vivid to them than the mere testimony that "A.W. was angry." However, as we explained above, because defense counsel made no offer of proof, we cannot assume that Hoffman's testimony would have added new *content* to the evidence that was before the jury. Thus, we cannot assume that the jury would have heard such details; we must assume that the testimony would have echoed defendant's, albeit through the mouth of a potentially more credible witness. This minor increase in the evidence favorable to defendant could not have significantly strengthened his defense, so no first-prong plain error occurred.

¶ 60                                    III. CONCLUSION
¶ 61        For the reasons stated, we affirm defendant's convictions. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 62        Affirmed.

¶ 63        JUSTICE McLAREN, specially concurring:

¶ 64        I specially concur because I wish to address an aspect of this disposition that subordinates the right to anonymity of a sexual abuse victim to the format of the caption and body of an appellate court opinion.

¶ 65        Approximately 25 years ago, this court addressed the issue of the anonymity of adult and minor sexual crime victims. Typically, anonymity could be effected by identifying the victim by his or her initials.

¶ 66        However, in instances of incest or situations where the victim had the same surname as the defendant, initials would not necessarily achieve anonymity. Several appeals have been formatted wherein the defendant's surname was replaced with an initial. See *People v. M.H.*, 2014 IL App (3d) 130083-U (three siblings were abused by their parent); *People v. Ricky E.T.*, 405 Ill. App. 3d 98 (2d Dist. 2010) (defendant was convicted of sexual exploitation of his daughter); *People v. Robert P.*, 354 Ill. App. 3d 1051 (3d Dist. 2005) (in addition to also

using initials for the victim, who was the defendant's adopted child, the court even used an initial for the last name of the adoptive mother's brother, with whom the victim had previously resided); *People v. Anthony Roy W.*, 324 Ill. App. 3d 181, 183 (3d Dist. 2001) (the victim was the defendant's daughter); *People v. M.D.*, 231 Ill. App. 3d 176, 180 (2d Dist. 1992) (defendant was convicted of committing aggravated criminal sexual assault upon his wife; "We refer to defendant and the victim by their initials in order to protect the victim's identity."). Nevertheless, there are numerous instances in the recent past, including this case, where dispositions did not substitute an initial for the surname of the defendant.

¶ 67    The Illinois Supreme Court rules do not provide for the use of initials in the caption except in appeals involving mental health cases (Ill. S. Ct. R. 330(b) (eff. July 1, 2017)), the Juvenile Court Act (Ill. S. Ct. R. 660(c) (eff. Oct. 1, 2001)), and adoption cases (Ill. S. Ct. R. 663 (eff. Oct. 1, 2001)). Even there, Rules 660(c) and 663 provide only that the minor shall be identified by first name and last initial or by initials only. See Ill. S. Ct. Rs. 660(c), 663 (eff. Oct. 1, 2001). However, the Style Manual for the Supreme and Appellate Courts of Illinois (4th ed. rev. 2012) (hereinafter Style Manual 4th) and the Style Manual for the Supreme and Appellate Courts of Illinois (5th ed. rev. 2017) (hereinafter Style Manual 5th) both provide the following examples of the approved captions in adoption, custody, or support proceedings and juvenile court proceedings:

> "*In re* ADOPTION [*or* CUSTODY] OF JOHNNY D. (Bill Smith and Ann Smith, Petitioners-Appellees, v. Jane D., Respondent-Appellant)." Style Manual 4th § 1(C), at 4; Style Manual 5th § 1(C), at 5.

> "*In re* J.D., a Minor (The Department of Children and Family Services, Petitioner-Appellant, v. Jane D., Respondent-Appellee)." Style Manual 4th § 1(C), at 5; Style Manual 5th § 1(C), at 7.

¶ 68    Thus, the Illinois Supreme Court and the Reporter of Decisions approve of the use of an initial for the respondent's last name in such cases even though the applicable supreme court rules provide only for the use of such an initial for the minor.[1]

¶ 69    While the legislature has acted to protect the anonymity of child victims of sexual crimes at the law enforcement and circuit court levels (see the Privacy of Child Victims of Criminal Sexual Offenses Act (725 ILCS 190/1 *et seq.* (West 2016))), curiously there does not appear to be a supreme court rule specifically concerning the protection of the anonymity of sexual crime victims, regardless of their age, in the disposition of criminal appeals. That would seem to suggest that there is no authority for using initials or otherwise attempting to hide the identity of these victims in these appeals. But we do so, and we have for at least 25 years. The use of the victim's initials exists as a practice despite the lack of a supreme court rule mandating, prohibiting, or authorizing their use. As I have stated before, "Absence of evidence is not necessarily evidence of absence." *Stemple v. Pickerill*, 377 Ill. App. 3d 788, 798 (2007) (McLaren, J., specially concurring). The same logic applies here as well. More importantly, historical fact supports this logic, and compassion compels its implementation.

---

[1]The use of this practice can be seen in the recent case of *In re Nevaeh R.*, 2017 IL App (2d) 170229 (captioned as "*In re* NEVAEH R. and MARY R., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Gabriel R., Respondent-Appellant)"). I also note that, in order to protect the anonymity of the minors in that case, this court went so far as to abbreviate the last name of the minors' mother ("Melissa O."), who had a different last name from the children.

¶ 70    Be that as it may, it would be helpful if the supreme court or the legislature would address the reality that, in some cases, especially where surnames are identical, there are conflicting interests and resolve the conflict.