NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 200082-U

NO. 4-20-0082

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| CHRISTOPHER K. WHITLEY, | ) | No. 15CF236 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Glenn, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justice Harris concurred in the judgment.
Justice Turner specially concurred.

**ORDER**

¶ 1    *Held*: (1) The appellate court affirmed, finding the State's evidence was sufficient to
       prove defendant guilty of aggravated driving under the influence.

       (2) Defendant failed to establish plain error where the trial court allowed an
       expert to testify defendant was impaired by alcohol based on an arresting officer's
       report and video when the expert was not present and did not conduct the
       horizontal gaze nystagmus test.

¶ 2    In April 2019, a jury convicted defendant, Christopher K. Whitley, of aggravated

driving under the influence (DUI) (625 ILCS 5/11-501(d)(2)(C) (West 2014)). On appeal,

defendant contends (1) the trial court failed to prove him guilty beyond a reasonable doubt and

(2) the trial court erred in allowing the State's expert to opine defendant was under the influence

of alcohol based on the expert's review of an arresting officer's report and video of the field

sobriety tests when the officer did not personally conduct the horizontal gaze nystagmus (HGN) test.

¶ 3        We determine the evidence was sufficient to convict defendant beyond a reasonable doubt. We further conclude defendant forfeited review of the issue concerning the expert's testimony and failed to show plain error in admission of the testimony. Accordingly, we affirm.

¶ 4                                I. BACKGROUND

¶ 5        On June 15, 2015, the State charged defendant with aggravated DUI in connection with a May 17, 2015, traffic stop. In April 2019, a jury trial was held.

¶ 6        During opening statements, defense counsel told the jury it would hear evidence about field sobriety tests, including the HGN test. Counsel told the jury "if you don't test almost perfectly, if the tests are not administered almost perfectly, the results are compromised. And if the results are compromised, then reliability and accuracy of the test is basically out the window." Counsel also stated "[w]e'll see if this test, this one standardized field sobriety test was administered correctly. We expect to have a witness to testify that it was not administered completely correctly."

¶ 7        At trial, Mattoon Police Captain Raymond Hall Jr., testified, on May 17, 2015, he was on patrol in an unmarked squad car. Shortly before 12:56 a.m., Hall saw a truck driven by defendant accelerate rapidly at an intersection. Hall followed the truck eastbound and did not see defendant commit any traffic violations. However, after the truck stopped at a stop sign, it crossed into another intersection, sped up rapidly, accelerated, and "kind of moved to the left." Hall saw a car coming toward the cross street from the south slow down. Traffic from that direction did not have a stop sign. Hall turned on his emergency lights and stopped the truck.

¶ 8        Hall identified himself and asked defendant for his driver's license and insurance. Hall testified defendant attempted to shake his hand and mumbled, "Hi, Ray." Defendant had no trouble handing over the documents. When Hall asked defendant if he knew the reason for the stop, defendant said he thought it was due to the oncoming car failing to stop at the stop sign. Hall responded there was no stop sign at the intersection, and defendant replied, "[O]h, I missed that." During the conversation, Hall observed defendant had bloodshot and glassy eyes and an odor of alcohol coming from his breath. Based on his observations, Hall called Officer Michael Johnson to investigate a possible DUI.

¶ 9        Hall testified his squad car's dash camera recorded both the traffic stop and the DUI investigation. The State played a video clip of the traffic stop for the jury. The video showed defendant's vehicle accelerate through the intersection and swerve to avoid the oncoming car. Because of loud music coming from defendant's truck, some of the conversation between Hall and defendant was difficult to hear.

¶ 10        On cross-examination, Hall stated he was unaware defendant had oral surgery about four or five days before the incident. He agreed any gauze in defendant's mouth could trap alcohol. He did not recall defendant stumbling getting out of the truck or leaning against it to brace himself when he exited it for field sobriety tests.

¶ 11        Johnson testified about the field sobriety tests administered to defendant. In 2015, Johnson was an officer assigned as a patrolman to the Mattoon Police Department's DUI enforcement unit. He had investigated over 60 DUIs over the course of his career. Before defendant's arrest, he had investigated 30 DUIs and made 12 arrests. He testified he previously received a National Highway Traffic Safety Association (NHTSA) certification in field sobriety testing from the University of Illinois. He took a refresher course on standardized field sobriety

tests between March and April 2014. As part of the refresher course, he administered the HGN field sobriety test to five subjects who had consumed alcohol to determine if the subjects were impaired and unable to operate a vehicle safely.

¶ 12   On May17, 2015, at around 1 a.m., Johnson responded to Hall's call. When he arrived, he saw Hall's squad car and defendant's truck. Johnson approached the truck and spoke with defendant. Johnson testified he could smell the odor of alcohol from about two to three feet away and observed defendant had glassy and bloodshot eyes. Johnson identified himself and asked defendant if he had consumed any alcohol. Defendant responded he had a "couple beers" at a wedding reception at the VFW. Johnson stated defendant's speech was slurred.

¶ 13   Johnson testified field sobriety tests are classified as standardized and non-standardized tests. The common non-standardized tests, also known as divided-attention tests, are the alphabet test, the backwards-counting test, the touching-fingers test, and the finger-to-nose test. The tests help aid an officer's investigation of an individual's ability to drive. The three standardized tests are the HGN test, the walk-and-turn test, and the one-leg-stand test.

¶ 14   Johnson first asked defendant to recite 13 letters of the alphabet from the letter D to the letter Q. Johnson testified he administered the test as he was trained and per NHTSA standards. Johnson determined defendant failed the alphabet test because he recited from the letter A to I, then skipped all the way to Q, said the letter J, and then stopped. His speech continued to be slurred. On cross-examination, Johnson stated the NHTSA manual did not require an officer to use a word associated with the letter when instructing a subject on the alphabet test. A copy of the manual in the record describes the alphabet test under a section labeled "Additional Techniques" and states "[f]or example, you might say to a driver, 'Recite the alphabet beginning with the letter *E* as in Edward and stopping with the letter *P* as in Paul.' "

¶ 15 Johnson next asked defendant to count backwards from 69 to 42 in accordance with NHTSA standards. Defendant failed the counting test because he said several numbers twice, went backward and forward a "little bit in the middle," and did not go all way down to 42. Johnson acknowledged nerves and the environment, such as defendant's passenger interrupting or trying to correct him, could have led to mistakes. Johnson did not ask defendant if he had attention-deficit disorder (ADD) or another disability that affected his speech.

¶ 16 Johnson stated the odor of alcohol, bloodshot and glassy eyes, slurred speech, and defendant's inability to complete the counting and alphabet tests were indicators of impairment. Based on defendant's performance on the divided-attention tests, Johnson determined further investigation was necessary.

¶ 17 Johnson next administered the HGN test, a standardized test, which is designed to detect involuntary jerking of the eye by moving a stimulus, such as a finger, stylus, or flashlight, in front of the eyes. Johnson explained he did not perform the walk-and-turn or one-leg-stand tests because defendant had a back issue from a prior car accident that affected his ability to walk or stand. Johnson asked defendant to step out of his truck. While stepping out of the truck, defendant told Johnson he lived only a block away, when he actually lived at least seven blocks away. Because defendant was facing Hall's squad car, Johnson asked Hall to turn off his front lights. Defendant stood between the squad car and the truck, while Johnson stood four feet away from defendant. From that distance, Johnson could still smell the odor of alcohol and observed defendant's speech was slurred. Johnson made sure the surrounding area was clear of distractions. He said he was supposed to avoid movement behind him when administering the test. He could not recall anything about traffic but said he did not restrict traffic.

¶ 18        Johnson first did preliminary testing to determine if defendant had any underlying medical conditions that would prevent proper testing. After ruling out underlying medical conditions, Johnson performed the first test, the lack of smooth pursuit. Johnson explained he moved his finger as a stimulus two seconds to a side, four seconds back to the other side, and then two seconds back to center, repeating the cycle two times. Johnson did not use a stopwatch or count to calculate the four seconds it took to move his fingers. He held his fingers approximately 12 inches from the center of defendant's face to start. Both of defendant's eyes showed a lack of smooth pursuit, which was like a wiper skipping over a car's windshield, and Johnson determined there were two indicators of impairment, one for each eye.

¶ 19        Johnson next tested for distinct and sustained nystagmus at the maximum deviation, which detects if the eye involuntary jerks while trying to focus on the stimulus at the maximum distance. Johnson moved his fingers as far as the eye could look to one side and held them for four seconds to observe whether the eye movement was distinct and sustained. Johnson then moved his fingers to the other side and held it for four seconds. He then repeated the test. While conducting the test, Johnson stated he held the stimulus 12 inches from the center point but clarified the 12 inches was "not from the outside points." He said, "I don't know how far it would have been out there." He stated he conducted the test in accordance with NHTSA standards. Johnson detected one clue of impairment per eye, which was verified on the second pass. On cross-examination, the following colloquy occurred:

> "Q. [W]hen you're administering the test, you're going to
>
> the side correct—on one of the tests, at least, you go to the side
>
> with the stylus?
>
> A. On every test I go to the side.

Q. Yeah, okay, and you're saying that you adjusted each time to come in to keep it 12 inches?

A. Absolutely not, no. Twelve is where the center point where you start.

Q. So there are times that you admit that the stylus or the tip of the light is more than 12 to 15 inches away from his eyes, correct?

A. Yes, when I'm out to the side, I mean, it would be 12 inches from here (indicating), and then however far that would be, I'm sure with some math you could figure it out."

A copy of the NHTSA manual in the record instructs to "[p]osition the stimulus approximately 12-15 inches *** in front of the subject's nose, and slightly above eye level." It does not provide a distance from the center when moving the stimulus to the side.

¶ 20        Johnson next conducted the last part of the HGN test by checking for the onset of nystagmus before a 45-degree angle. Johnson asked defendant to follow the stimulus with his eyes from the center point until reaching 45 degrees, which was approximately before shoulder length. Johnson detected one indicator of impairment in each eye when he administered the test. Johnson testified, based on the totality of the circumstances, he believed defendant was impaired due to the use of alcohol and thus placed defendant under arrest for DUI.

¶ 21        The State played the dash camera video showing Johnson's DUI investigation and defendant's arrest. While viewing the video, Johnson noted it depicted defendant swaying back and forth and leaning on the truck's tailgate. He noted there was not a lot of traffic but could not recall if cars were constantly passing behind him. The video content is generally consistent with

Johnson's testimony. It shows defendant exit the truck without obvious difficulty but shows him swaying side to side during the HGN testing. The video does not show the presence of traffic.

¶ 22 At the police station, defendant refused to give a breath sample. A booking video showed Johnson selecting a second mouthpiece for the breath test before defendant refused to take the test. Johnson stated he did so because the first one was broken despite being sealed. Defendant did not mention the broken mouthpiece when he refused the test. Johnson did not ask defendant if he had stitches in his mouth. Johnson did not recall if defendant's jaw was swollen and did not know defendant had his wisdom teeth extracted five days before the incident. He acknowledged medication may cause bloodshot eyes but did not ask defendant if he was taking anything.

¶ 23 The State called officer Anthony Shovan, the Illinois State Police breath alcohol testing section instructor, as an expert witness. After questioning Shovan about his training and qualifications to testify about NHTSA standards and the NHTSA manual, the State sought to qualify him as an expert in "field sobrieties and DUI investigation." When asked if there were any objections, defense counsel stated "yes," without further elaboration. When the trial court asked counsel if he would like "to be heard further on that," he stated "no."

¶ 24 Shovan testified the three standardized field sobriety tests are the HGN, the walk-and-turn, and the one-leg-stand. He also testified about non-standardized divided-attention tests, including the alphabet and counting tests. Shovan explained there are three different phases of a DUI investigation. Phase one is "vehicle in motion," where the officer observes signs of impairment such as improper lane usage, wide turns, or misuse of traffic signs.

¶ 25 When Shovan began to describe phase two, the following colloquy occurred:

"Q. What is phase two?

- 8 -

A. Phase two is personal contact or interview questioning stage where we have seen them do whatever they've done, we have enough information to warrant a stop.

[Defense Counsel]: Objection, Judge. It's inappropriate.

THE COURT: Do you need to be heard?

[Defense Counsel]: Yeah.

(Sidebar held on the record out of the presence and hearing of the jury.)

[Defense Counsel]: I would think it's inappropriate to say what we do and then with the—this is basically what given for probable cause that that's for a jury to decide. That's for Your Honor to decide. This witness can't give whether the officer had probable cause or not. This is not within his area of testifying. He's only testifying about field sobriety. I don't think it's appropriate, basically improperly bolsters—

[State's Attorney]: We asked for him to be qualified as an expert in field sobriety and DUI investigation. He's going to testify that the officer is taught to observe the totality of the circumstances from beginning to end. And he's telling what he teaches in these field sobriety classes that you start here and end here. He's also testified that's what's in the materials to teach, which is the defense expert is going to say it doesn't say that.

[Defense Counsel]: I think the evidence he might have—

[State's Attorney]: You can't—

THE COURT: Just a moment.

[Defense Counsel]: I think it's improper bolstering.

THE COURT: I don't find it to be improper bolstering. The

objection is overruled."

¶ 26 Shovan testified phase two is "personal contact," when the officer talks to the driver to see if they detect an odor of alcohol or see containers with alcohol or prescription drugs. An officer would also look at the driver's appearance to detect bloodshot and glassy eyes, slurred speech, thick tongue, or soiled clothing. However, an odor of alcohol by itself would not establish impairment. Shovan agreed individual characteristics could be caused by things other than alcohol impairment such as allergies, a speech impediment, or being awoken from sleep. Phase three is the prearrest screening phase, during which the officer would have the driver perform field sobriety tests.

¶ 27 Shovan testified about the HGN test and its procedures, stating the HGN test consists of three different tests: (1) lack of smooth pursuit, (2) distinct and sustained nystagmus at maximum deviation, and (3) onset of nystagmus before a 45-degree angle. Each test checks for a clue of impairment in each eye, for a total of six possible clues. Shovan admitted there were possible causes of nystagmus other than alcohol impairment. The following colloquy then occurred:

"Q. Trooper Shovan, did you review any materials from this case?

A. Yes. I reviewed a report, a field report and a video.

- 10 -

Q. And based upon your review, and based upon your experience as a field sobriety instructor, did the officer in that video perform the HGN test properly?

A. From what I have seen of the video, he did the HGN test correctly.

Q. Now, were you able to see the results of those—that test?

A. From the in-car video camera, I was able to see the person standing there. I wasn't able to see the eyes of the individual, and I was able to see from the back of the officer and was able to see his hand movements as it went across his body.

Q. And based upon that, you you're saying—

A. Yes.

Q. —you believe he performed the test correctly?

Based upon your review of the materials and your training and experience, were you able to form an expert opinion as to whether or not the Defendant was impaired by alcohol?

A. Based off of the report and the video, I would say yes.

Q. And is that opinion to a reasonable degree of certainty in your field?

A. Yes."

Defense counsel did not object.

¶ 28      When further asked on cross-examination about the basis for his opinion concerning the HGN test, Shovan stated: "I'm basing my opinion off of watching the video to see how the officer conducted the test and then his findings that he wrote in the report." The following colloquy further occurred:

"Q. Okay. But if—if you're relying on his subjective interpretation of his findings, correct?

A. His opinion, if that's what you're getting at.

Q. Yes.

A. Yes, sir.

Q. Because there's nothing objective that you can go back and replay and say, yeah, I see that, correct?

A. Visibly seeing the eyes moving, no. The test on the way he conducted it, yes.

Q. And as we sit here today, all you can rely on is what the officer is saying he saw as it pertains to that test?

A. Yes, sir.

Q. Okay. And there's no way to scientifically verify that, would you agree with that?

A. Of what?

Q. Of what he said he saw?

A. If I could know what he saw?

Q. Yes?

A. No, I could not."

¶ 29    Defense counsel further questioned Shovan about the testing as follows:

"Q. [A]s the teacher of this program through NHTSA, you would agree with me that if the tests are not done right, they are not to be considered valid?

A. Correct. They are to be done as instructed, and in the way that—

Q. Okay. And if the officer deviates from the instructions, then we should disregard the results, correct?

A. Depends on the instructions. If they don't ask a certain question in the walk and turn, or don't tell them not to count to nine, then yes, that portion of the test would be omitted, but not the whole test.

Q. Okay. And you have Exhibits 1, and I believe 2 in front of you. How far is the instrument, the flashlight pen for HGN, how far away is that supposed to be held from the Defendant's face?

A. Twelve to fifteen inches.

Q. Okay. And so if the officer at issue in this case has testified earlier that it was 16 to 18 inches away from his face, it would have been done improperly, correct?

A. NHTSA's guidelines tells you to go approximately 12 to 15 inches is their guidelines.

Q. And if this officer says, and has said under oath, that he did it 16 to 18 inches away, it would have been done incorrectly, correct?

A. The way he held the stimulus to the individual's face to start, yes.

Q. And so we should disregard the results because the test is done wrong, correct?

A. If the individual kept the stimulus away the entire time at a different distance, then it would not have been done as, as NHTSA guidelines suggest.

Q. And NHTSA says for these test to be results, because there's all kinds of PHD's [*sic*] that wrote every chapter in those books, then if the tests aren't done right, then the results—

[State's Attorney]: Objection, Your Honor. He's badgering the witness.

THE COURT: Overruled.

Q. Would you agree with that?

A. If the entire test was conducted at the 16 inches and he did not move forward or backwards during that, which as people do it, they tend to move, that's why they gave you a range, but, yes 12 to 15 inches is what it states in the manual.

Q. And 16 to 18 would be an invalid test, correct?

- 14 -

A. That would be outside of the scope that NHTSA

suggests that you do."

¶ 30        Shovan disagreed the NHTSA training manual required an officer, when conducting the alphabet test, to say the letter and a word associated with the letter. Shovan believed the officer had done the alphabet test correctly even if he only used the letters. As to the counting test, Shovan stated there is no definite starting or ending point; only a sequence of 15 or more numbers had to be used. Shovan also acknowledged there are 38 possible causes for nystagmus, including lights from passing cars.

¶ 31        Dr. Ronald Henson, an expert in field sobriety tests and DUI investigations, testified for defendant. Henson testified the odor of alcohol indicates someone drank alcohol, but not how much or if the person was intoxicated. He also initially stated glassy and bloodshot eyes and slurred speech were not definite indicators of impairment. However, on cross-examination, Henson conceded bloodshot eyes are an indicator of alcohol impairment. Henson also testified oral surgery could affect speech.

¶ 32        Henson testified the reliability of the HGN test is compromised if the officer held the stimulus outside of the 12-to-15-inch range or if the officer failed to hold the stimulus for a minimum of four seconds at the maximum deviation. He also testified flashing and rotating lights or lights from passing traffic could create an optokinetic nystagmus, an involuntary eye movement caused by sharply contrasting moving images, which would also give a false positive. For example, optokinetic nystagmus could be produced if a car's lights were on or reflected off the houses and defendant was facing them. Henson reviewed the DUI questionnaire pertaining to defendant and noted it was blank other than a notation when *Miranda* warnings (see *Miranda v.*

- 15 -

*Arizona*, 384 U.S. 436 (1966)) had been given. The questionnaire did not require an officer to ask if the person tested had been recently seen by a doctor or dentist.

¶ 33        Henson opined the investigation and pre-exit tests were not conducted correctly. However, he stated he did not have enough information to give an opinion about the HGN test and agreed nothing he saw indicated the test had been done incorrectly. In his opinion, it could not be determined whether defendant was impaired due to alcohol. After Henson's testimony, the court instructed the jury the HGN test results "are not used to correlate the test results with any particular blood alcohol level or range or level of intoxication."

¶ 34        Defendant testified that, on May 16, 2015, he worked until 5:30 p.m. At around 6 p.m., he met his stepbrother, Jarrod Hudson, and friend, Jaime Johnson, at the VFW, where he drank two beers. Defendant offered a ride home to Hudson, Jaime, and Penny Day, Jaime's fiancée. Day did not want to leave, and defendant offered to come back later to give her a ride home. Defendant left the VFW around 6:30 or 7 p.m. and said he did not stop to have drinks before or after dropping off Hudson and Jaime. At around 12 or 12:30 a.m., defendant went to the VFW to pick up Day. He testified he thought he was capable of safely operating a vehicle and denied drinking alcohol after picking up Day.

¶ 35        As he approached the intersection before the traffic stop, defendant saw a car proceeding through the intersection, coming from the side. Because the car was coming at him, he gave his car a "a little gas" and got out of the way. Defendant pulled over as soon as Hall activated his lights. Defendant said he and Day told Hall they each lived a block away and added, "a block away from where we were going is what I was trying to get through." Defendant denied mumbling or fumbling when retrieving his driver's license and insurance card. He also assumed his jaw looked swollen at the time of the stop because he had oral surgery four days

earlier. Defendant said Day kept talking while Johnson asked him to do the divided-attention tests. He acknowledged he did not recite the alphabet as instructed by Johnson and missed a few numbers when counting backwards. He said he did not have any trouble getting out of the truck.

¶ 36        Defendant testified he stood four or five feet in front of Hall's squad car and said, even though the front lights of Hall's car were turned off, the car's back strobe lights were on, which caused him trouble during the HGN test because he could not see what was going on. He agreed, however, the video did not show the back strobe lights reflecting off the car, the houses, or the street in the back.

¶ 37        At the police station, defendant told Johnson he was supposed to go to Effingham but decided not to because he had a couple of beers. Defendant said he refused the breath test because he did not trust the machine. Defendant walked home after posting bond.

¶ 38        Defendant testified he still had sutures in the mouth at the time of the May 17, 2015, traffic stop. He said Johnson did not search his mouth for foreign objects and said he was still spitting blood at that time because of his oral surgery. Defense exhibits included a photo taken on May 12, 2015, after defendant had his wisdom teeth extracted, and the bill for the extraction. Defendant identified defense exhibit No. 8 as a screenshot from the booking video showing his right cheek, which was swollen. Defendant added he had been diagnosed with ADD at the age of 12 and had back and neck issues.

¶ 39        The defense recalled Detective Johnson to testify. Johnson testified the rear flashing lights on Hall's squad car were left on for safety purposes. Hudson testified and corroborated defendant's version of the events at the VFW and stated he would not have accepted the ride from defendant if defendant had been impaired.

¶ 40       The parties stipulated Dr. Brandon Combs, a chiropractic physician, treated defendant for cervical spine and thoracic spine issues from 2012 until April 2013, when he reached maximum medical recovery. Physician Assistant Michael Heise testified as an expert in primary health care and stated he diagnosed defendant in October 2018 with ADD. Defendant had also been diagnosed with ADD when he was 12. Defendant was not taking medication for ADD on May 17, 2015, and Heise stated he could not say with any certainty "ADD was present in [defendant]" on that date. However, Heise stated a person with ADD who is not taking medication will have worsening symptoms.

¶ 41       In closing arguments, the parties generally focused on the circumstantial evidence of impairment and whether the field sobriety tests were conducted properly. During deliberations, the jury sent the court two notes. In the first note, the jury requested to see the videos of the field sobriety tests and booking. Over defense counsel's objection, the court allowed the jury to view the videos in the courtroom. In the second note, the jury asked for clarification of a jury instruction, writing: "we need more clarification of *** [']impaired to reduce his ability to think and act with ordinary care.['] " The court instructed the jury they were "currently in possession of all criminal jury instructions appropriate to the facts of this case."

¶ 42       The jury found defendant guilty of DUI. After the jury was excused, the court found him guilty of aggravated DUI based on his previous convictions.

¶ 43       Defendant filed a motion for a new trial, asserting: (1) a sufficiency of the evidence challenge, (2) a claim of juror misconduct during deliberations, and (3) a claim a sleeping juror deprived him of a fair trial. The trial court granted the motion based on allegations from a juror, J.S., who stated that, at the start of deliberations, another juror said he grew up with defendant, heard he used his money to get out of trouble, and " '[it was] finally right that he gets

what he deserves.' " J.S. said it influenced his decision in the case. However, the State subsequently moved to reinstate the verdict based on newly discovered evidence the testimony of J.S. was the result of subornation of perjury by defendant and defense counsel. After a hearing, the court reinstated the verdict, finding J.S.'s testimony was either perjured or inaccurate.

¶ 44      New posttrial counsel filed a motion for a new trial in which he alleged in part the trial court erred in allowing the HGN test because Johnson's testimony about the distance of the stimulus from the center showed the test was performed incorrectly. He also alleged permitting Shovan to testify defendant was intoxicated improperly bolstered Johnson's testimony because expert testimony was unnecessary. He stated Shovan's "expert testimony, as it related to the question of whether or not the field sobriety tests, or processes of the investigation [were] properly handled was acceptable." However, he alleged Shovan's opinion "to the state of intoxication of [defendant] was a lay opinion and the use of the video and the police reports to formulate that opinion was improper." The court denied the motion and sentenced defendant to three years' incarceration. This appeal followed.

¶ 45      II. ANALYSIS

¶ 46      A. Sufficiency of the Evidence

¶ 47      Defendant first argues the evidence was insufficient to convict him because the State failed to prove beyond a reasonable doubt he was under the influence of alcohol.

¶ 48      " 'When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ngo*, 388 Ill. App. 3d 1048, 1052, 904 N.E.2d 98, 102 (2008) (quoting *People v. Singleton*, 367 Ill. App. 3d 182, 187, 854 N.E.2d 326, 331 (2006)).

The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81, 903 N.E.2d 388, 406 (2009). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable[,] or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98, 890 N.E.2d 487, 496-97 (2008) (citing *People v. McDonald*, 168 Ill. 2d 420, 444, 660 N.E.2d 832, 842 (1995)).

¶ 49    Section 11-501(a)(2) of the Illinois Vehicle Code provides "[a] person shall not drive or be in actual physical control of any vehicle within this State while *** under the influence of alcohol." 625 ILCS 5/11-501(a)(2) (West 2014). To prove a defendant guilty of DUI, the State must prove the "driver was under the influence of a drug or alcohol to a degree that rendered him incapable of driving safely." *People v. Gordon*, 378 Ill. App. 3d 626, 631-32, 881 N.E.2d 563, 567 (2007). The Illinois pattern jury instruction used in this case stated "[a] person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." Illinois Pattern Jury Instructions, Criminal, No. 23.29 (4th ed. 2000).

¶ 50    Circumstantial evidence can prove a defendant guilty of DUI. *People v. Hostetter*, 384 Ill. App. 3d 700, 712, 893 N.E.2d 313, 323 (2008). "Circumstantial evidence is proof of certain facts and circumstances from which the fact finder may infer other connected facts which usually and reasonably follow from the human experience and is not limited to facts that may reasonably have alternative, innocent explanations." *People v. Diaz*, 377 Ill. App. 3d 339, 345, 878 N.E.2d 1211, 1216-17 (2007). To obtain a DUI conviction, the State need not present chemical evidence from a Breathalyzer or a blood test. Instead, "the credible testimony of the

arresting officer may be sufficient to prove the offense." *Diaz*, 377 Ill. App. 3d at 345. Such testimony renders scientific proof unnecessary. *Gordon*, 378 Ill. App. 3d at 632. A defendant's refusal to submit to a breath test after his arrest constitutes circumstantial evidence of his consciousness of guilt. *Diaz*, 377 Ill. App. 3d at 345; see also *People v. Garriott*, 253 Ill. App. 3d 1048, 1052, 625 N.E.2d 780, 784 (1993) (holding the jury may infer the driver refused to submit to a breath test because he knew it would confirm he was under the influence).

¶ 51 Here, there was ample evidence defendant was under the influence of alcohol such that he could not drive safely or think and act with ordinary care. Defendant sped up and swerved to avoid a vehicle because he "missed" the oncoming vehicle did not have a stop sign. Defendant "mumbled," his speech was slurred, his eyes were bloodshot and glassy, and he had the odor of alcohol on his breath. He also admitted consuming alcohol. When Johnson conducted the field sobriety tests, defendant was unable to properly complete the alphabet and counting tests. Viewing the video of the tests, the jury could easily conclude defendant performed poorly on them. During the HGN test, defendant swayed and showed six signs of nystagmus. Thus, Johnson opined defendant was intoxicated. Defendant then refused breath testing, which the jury could consider as circumstantial evidence of consciousness of guilt.

¶ 52 Defendant presents a litany of reasons to explain his performance on the tests and the officers' observations. For example, he argues his recent oral surgery explained his slurred speech and gauze in his mouth trapped the odor of alcohol. He said Day distracted him during the divided-attention tests and reflections of light affected the HGN test. He suggested back issues or ADD could further explain his actions, and he did not trust the breath machine because of a broken mouthpiece. However, he did not provide the officers with those explanations at the time of his stop and arrest.

¶ 53    The jury heard testimony from both the State's and defendant's witnesses, as well as defendant's own testimony. Video evidence was also presented and viewed by the jury. It is the jury's function "to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Mo*ss, 205 Ill. 2d 139, 164, 792 N.E.2d 1217, 1232 (2001). Here, it was reasonable for the jury to determine defendant was under the influence of alcohol.

¶ 54    Defendant also argues the testing was completed incorrectly. However, the record does not conclusively support defendant's claim. Johnson explained the testing in detail, including an explanation of his starting point for the HGN test at the required distance. He explained the distance would differ as the stimulus was moved out to the side of the subject's face. The NHTSA manual merely states the 12-to-15-inch distance is the starting point. Indeed, even defendant's expert could not say the HGN test was performed incorrectly. Johnson also disagreed there was any error in how he conducted the alphabet test. The NHTSA manual provides an example of using a word associated with the letters. It does not definitively require the officer to do so. Shovan also testified the tests were performed correctly.

¶ 55    Further, even in the absence of the HGN test results, given the credible testimony from two police officers, along with defendant's refusal to take a Breathalyzer test, scientific proof of intoxication was unnecessary to sustain defendant's conviction for driving under the influence of alcohol. See *People v. Morris*, 2014 IL App (1st) 130152, ¶ 22, 16 N.E.3d 269 (citing *Gordon*, 378 Ill. App. 3d at 632). Accordingly, viewing the evidence in the light most favorable to the State, we cannot say the evidence in this case was so unreasonable, improbable, or unsatisfactory it created a reasonable doubt of defendant's guilt.

¶ 56                                B. Expert Testimony

¶ 57    Defendant next contends the trial court erred by allowing Shovan to testify defendant was under the influence of alcohol without laying a proper foundation when Shovan was not present at the scene and did not administer the HGN test. He further argues allowing the testimony improperly bolstered Johnson's credibility. The State argues defendant forfeited the issue.

¶ 58    "Generally, '[t]o preserve an issue for appeal, the defendant must have raised the issue in a motion *in limine* or an objection at trial and also in a posttrial motion.' " *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7, 970 N.E.2d 90 (quoting *People v. Brown*, 319 Ill. App. 3d 89, 96, 745 N.E.2d 173, 181 (2001)). "The failure to properly preserve an issue for review results in forfeiture." *Korzenewski*, 2012 IL App (4th) 101026, ¶ 7. "To challenge the foundation for admission of a test, a defendant must make a 'timely and specific objection to the foundation requirements.' " *Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 (quoting *People v. Rigsby*, 383 Ill. App. 3d 818, 823, 890 N.E.2d 1146, 1150 (2008)). " '[A]n objection requirement is especially important in cases of an improper foundation because errors in laying a foundation are easily cured.' " *Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 (quoting *Rigsby*, 383 Ill. App. 3d at 823). "A party cannot sit by and permit evidence to be introduced without objection and upon appeal urge an objection which might have been obviated if made at the trial." *People v. Trefonas*, 9 Ill. 2d 92, 98, 136 N.E.2d 817, 820 (1956). "Further, 'a defendant forfeits any issues as to the impropriety of evidence if he procures, invites, or acquiesces in the admission of that evidence.' " *Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 (quoting *People v. Durgan*, 346 Ill. App. 3d 1121, 1131, 806 N.E.2d 1233, 1241 (2004)).

¶ 59    Defendant concedes he did not specify the basis of his objection when Shovan was qualified as an expert. Indeed, the trial court specifically asked defendant if he would like to

provide the details of the basis for his objection, and defendant declined. However, defendant argues the reason for his objection was clear from the record. We disagree.

¶ 60        The record shows when defense counsel generically objected, it was broadly to Shovan's qualification as an expert. When he later objected based on an argument of "bolstering," it was in the context of probable cause for the stop. There was no objection at all to Shovan's opinion defendant was intoxicated. Thus, the issue is forfeited. However, defendant also argues plain error applies.

> " '[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' " *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 71, 115 N.E.3d 1207 (2018) (quoting *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 79-80 (2005)).

¶ 61    Our supreme court has twice addressed the propriety of testimony regarding the results of HGN testing in DUI cases. In *People v. McKown*, 226 Ill. 2d 245, 254, 875 N.E.2d 1029, 1034 (2007) (*McKown I*), the court considered whether it was error to admit HGN test results as scientific evidence without holding a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), "to determine whether the HGN test had been generally accepted as a reliable indicator of alcohol impairment by the relevant scientific community." Under the standard set forth in *Frye*, " 'scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' " *McKown I*, 226 Ill. 2d at 254 (quoting *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30, 821 N.E.2d 1184, 1188-89 (2004), quoting *Frye*, 293 F. at 1014).

¶ 62    The supreme court determined HGN testing is scientific and subject to the *Frye* requirements. *McKown I*, 226 Ill. 2d at 256-57. A *Frye* hearing was thus required "to determine if the HGN test has been generally accepted as a reliable indicator of alcohol impairment." *McKown I*, 226 Ill. 2d at 275. The supreme court remanded the cause to the trial court. *McKown I*, 226 Ill. 2d at 276.

¶ 63    The supreme court retained jurisdiction over the case and addressed the HGN testing again after the trial court conducted the requisite hearing and concluded HGN testing satisfied *Frye*. *People v. McKown*, 236 Ill. 2d 278, 293-94, 924 N.E.2d 941, 949-50 (2010) (*McKown II* ). There, the supreme court held, "HGN testing is generally accepted in the relevant scientific fields and that evidence of HGN test results is admissible for the purpose of proving that a defendant may have consumed alcohol and may, as a result, be impaired." *McKown II*, 236 Ill. 2d at 303. To be admissible, the test must be performed according to the protocol established

by the [NHTSA] by a properly trained officer. *McKown II*, 236 Ill. 2d at 306. To establish a proper foundation, the evidence must show the witness has been "properly trained and that he performed the test in accordance with proper procedures." *McKown II*, 236 Ill. 2d at 306.

¶ 64 Here, under *McKown II*, Shovan was not qualified to testify defendant was impaired by alcohol based solely on the HGN test, nor could he testify to the results of the HGN test when he did not personally perform it. Thus, his statement defendant was impaired by alcohol "[b]ased off of the report and the video" is troublesome to the extent it suggests Shovan relied on an HGN test he did not perform or incorrectly testified the HGN test alone was admissible to show actual impairment rather than proving defendant "may" have consumed alcohol and "may" be impaired as a result. See *McKown II*, 236 Ill. 2d at 303.

¶ 65 However, Shovan could testify as to whether the tests were performed correctly. In that regard, we first note, the record is not conclusive Shovan improperly opined defendant was impaired based on the HGN test, as suggested by defendant. Instead, Shovan stated his opinion was based on "the report and the video." Shovan did not state he relied specifically on the HGN test. Further, we do not consider that statement in a vacuum. The record as a whole makes it clear Shovan was very candid he could not verify what Johnson saw when he performed the HGN test. Indeed, defense counsel thoroughly explored that issue on cross-examination. In the context of the full record, it is clear Shovan's opinion was based on a general review of the materials and not his perceived results of an HGN test he admittedly did not perform himself or see the results as it was performed. See *Korzenewski*, 2012 IL App (4th) 101026 (2012), ¶ 22 (finding no error occurred when an officer testified he did not know how much alcohol the defendant consumed and acknowledged the HGN test, on its own, was not conclusive evidence of intoxication.) Thus, ultimately, we do not find error.

¶ 66 Defendant also suggests Shovan's testimony improperly bolstered Johnson's credibility. When expert testimony comments on the credibility of other witnesses, it may be found to invade the province of the jury to make credibility determinations. See *People v. Howard*, 305 Ill. App. 3d 300, 308-309, 712 N.E.2d 380, 385 (1999). The issue commonly arises when the veracity of witnesses is at issue. See, *e.g.*, *People v. Barajas*, 322 Ill. App. 3d 541, 555, 749 N.E.2d 1047, 1058 (2001) (describing two cases).

¶ 67 Here, Shovan's testimony did not comment on the credibility of other witnesses in the sense he did not testify other witnesses were lying or fabricated evidence. Instead, his testimony was offered to show the testing was properly performed, a question defendant himself placed at issue from the very beginning of the case and upon which he presented his own expert. The State was entitled to address it. See generally *People v. Cavazos*, 2022 IL App (2d) 120444-B, ¶ 78 (distinguishing *Howard*). Thus, Shovan's testimony was not improper "bolstering" of Johnson's credibility.

¶ 68 Finally, we observe, even if we were to find error, it would not rise to the level of plain error. Defendant contends first-prong plain error applies, arguing the evidence was closely balanced. To prove first-prong error applies, defendant must prove prejudicial error. That is, the defendant must show both there was plain error and the evidence was so closely balanced the error alone severely threatened to tip the scales of justice against him. *Stevens*, 2018 IL App (4th) 160138, ¶ 71.

¶ 69 " 'In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case.' " *Stevens*, 2018 IL App (4th) 160138, ¶ 71 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675). " 'A reviewing court's inquiry

involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility.' " *Stevens*, 2018 IL App (4th) 160138, ¶ 71 (quoting *Sebby*, 2017 IL 119445, ¶ 53). The issue does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence. *Stevens*, 2018 IL App (4th) 160138, ¶ 71 (quoting *Sebby*, 2017 IL 119445, ¶ 60).

¶ 70    Under the first prong of plain-error analysis, " '[w]hat makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive.' " *Stevens*, 2018 IL App (4th) 160138, ¶ 71 (quoting *Sebby*, 2017 IL 119445, ¶ 68). The question of whether an error is trivial, or *de minimis*, is not the inquiry. *Stevens*, 2018 IL App (4th) 160138, ¶ 71. However, when error occurred that "could not have changed the outcome of the case—it could not have 'tip[ped] the scales of justice against the defendant,' " it is not considered prejudicial. *People v. Wills*, 2017 IL App (2d) 150240, ¶ 53, 92 N.E.3d 1057 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007)).

¶ 71    For example, in *Sebby*, our supreme court determined the evidence was closely balanced where the testimony from the State's witnesses was largely consistent, but so was the testimony of the defendant and his witnesses. *Sebby*, 2017 IL 119445, ¶ 61. The supreme court stated the outcome of the case turned on how the fact finder resolved a " 'contest of credibility.' *Sebby*, 2017 IL 119445, ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07, 893 N.E.2d 653, 667 (2008)). The supreme court concluded the evidence was closely balanced because neither party presented extrinsic evidence to corroborate or contradict either version and because both versions were credible. *Sebby*, 2017 IL 119445, ¶ 63.

¶ 72    In contrast, in *People v. Davidson*, 160 Ill. App. 3d 99, 119, 514 N.E.2d 17, 31 (1987), the court rejected a claim of plain error where the evidence admitted in error was

- 28 -

cumulative of other evidence in the record. See also *In re M.S.*, 2018 IL App (1st) 172659, ¶ 28, 103 N.E.3d 973; *Wills*, 2017 IL App (2d) 150240, ¶ 58, 92 N.E.3d 1057 (stating no plain error where evidence at issue is cumulative of other evidence properly admitted). In that sense, plain-error analysis requires the same kind of inquiry as does harmless-error review, the difference being, in a harmless-error analysis, the State bears the burden of persuasion with respect to prejudice, while under a plain-error analysis, the defendant bears the burden. *People v. Magallanes*, 409 Ill. App. 3d 720, 727, 948 N.E.2d 742, 749-50 (2011).

¶ 73        A reviewing court may determine an error is harmless when "the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008).

¶ 74        Here, even if Shovan's testimony regarding defendant's appearance of intoxication was considered improper, it was cumulative to Johnson's testimony such that the closeness of the evidence did not threaten to tip the scales of justice against defendant. As we previously noted, the evidence without consideration of the HGN test at all was sufficient to convict defendant. The testimony of Hall and Johnson, defendant's appearance and his performance of the field sobriety tests aside from the HGN test, which the jury was able to see in the video, and his refusal to take the breath test were sufficient to find him guilty beyond a reasonable doubt. Even considering defendant's numerous offered explanations to discount the State's testimony, most of which he did not mention to the investigating officers, he has not shown the evidence was so closely balanced that any error in allowing Shovan's testimony about his observations from the tests and report threatened to tip the scales of justice against him. Thus, even if error occurred, it did not constitute plain error. "[A]bsent reversible error, there can be no plain error." *People v. Smith*, 2016 IL 119659, ¶ 39, 76 N.E.3d 1251.

¶ 75                                III. CONCLUSION

¶ 76            For the reasons stated, we affirm defendant's conviction and sentence for aggravated DUI.

¶ 77            Affirmed.

¶ 78            JUSTICE TURNER, specially concurring:

¶ 79            While I concur in affirming the trial court's judgment, I write separately because it was unquestionable error for Shovan, the State's expert witness, to opine on whether defendant was impaired. Shovan based his opinion, in part, on his review of a video depicting the manner in which a police officer administered the HGN test to defendant. Notably, Shovan was unable to observe defendant's eyes in the video recording. I further note Shovan rendered his opinion only after considering hearsay from an officer's police report. Accordingly, the opinion offered by Shovan was inappropriate and would not have been properly admitted if an objection had been made. Nonetheless, I concur because the error, though clear and obvious, did not rise to the level of first-prong plain error. See *supra* ¶ 68.